COMMITTEE FOR PUBLIC EDUCATION &
RELIGIOUS LIBERTY ET AL. *v.* NYQUIST,
COMMISSIONER OF EDUCATION
OF NEW YORK, ET AL.

No. 72–694. Argued April 16, 1973—Decided June 25, 1973*

*Together with No. 72–753, *Anderson* v. *Committee for Public Education & Religious Liberty et al.;* No. 72–791, *Nyquist, Commissioner of Education of New York, et al.* v. *Committee for Public Education & Religious Liberty et al.;* and No. 72–929, *Cherry et al.* v. *Committee for Public Education & Religious Liberty et al.,* also on appeal from the same court.

758

Powell, J., delivered the opinion of the Court, in which Doug-LAS, Brennan, Stewart, Marshall, and Blackmun, JJ., joined. Burger, C. J., filed an opinion concurring in Part II-A of the Court's opinion, in which Rehnquist, J., joined, and dissenting from Parts II-B and II-C, in which White and Rehnquist, JJ., joined, *post*, p. 798. Rehnquist, J., filed an opinion dissenting in part, in which Burger, C. J., and White, J., joined, *post*, p. 805. White, J., filed a dissenting opinion, in those portions of which

relating to Parts II–B and II–C of the Court's opinion BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 813.

*Leo Pfeffer* argued the cause for appellants in No. 72–694 and for appellees in Nos. 72–753, 72–791, and 72–929. With him on the brief were *Melvin L. Wulf* and *Burt Neuborne*. *Jean M. Coon*, Assistant Solicitor General of New York, argued the cause for Nyquist et al., appellees in No. 72–694 and appellants in No. 72–791. With her on the brief were *Louis J. Lefkowitz*, Attorney General, and *Ruth Kessler Toch*, Solicitor General. *Porter R. Chandler* argued the cause for appellants in No. 72–929 and for appellees Boylan et al. in No. 72–694. With him on the brief was *Richard E. Nolan*. *John F. Haggerty* argued the cause for appellant in No. 72–753. With him on the brief was *Louis P. Contiguglia.*†

MR. JUSTICE POWELL delivered the opinion of the Court.

These cases raise a challenge under the Establishment Clause of the First Amendment to the constitutionality of a recently enacted New York law which provides financial assistance, in several ways, to nonpublic elementary and secondary schools in that State. The cases involve an intertwining of societal and constitutional issues of the greatest importance.

---

†Briefs of *amici curiae* in No. 72–694 were filed by *Solicitor General Griswold, Assistant Attorney General Wood, Harriet S. Shapiro, Walter H. Fleischer,* and *Thomas G. Wilson* for the United States; by *Stephen J. Pollak, Benjamin W. Boley, John D. Aldock* and *David Rubin* for the National Education Association et al.; and by *Joseph B. Friedman* for the Baptist Joint Committee on Public Affairs. Briefs of *amici curiae* in all four cases were filed by *Henry C. Clausen* for United Americans for Public Schools; by *Nathan Lewin* and *Julius Berman* for the National Jewish Commission on Law and Public Affairs; by *Victor A. Sachse* and *Robert P. Breazeale* for Sidney A. Seegers et al.; and by *Don H. Reuben* and *Lawrence Gunnels* for Lawrence E. Klinger.

James Madison, in his Memorial and Remonstrance Against Religious Assessments,[1] admonished that a "prudent jealousy" for religious freedoms required that they never become "entangled . . . in precedents."[2] His strongly held convictions, coupled with those of Thomas Jefferson and others among the Founders, are reflected in the first Clauses of the First Amendment of the Bill of Rights, which state that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[3] Yet, despite Madison's admonition and the "sweep of the absolute prohibitions" of the Clauses,[4] this Nation's history has not been one of entirely sanitized separation between Church and State. It has never been thought either possible or desirable to enforce a regime of total separation, and as a consequence cases arising under these Clauses have presented some of the most perplexing questions to come before this Court. Those cases have occasioned thorough and

[1] Madison's Memorial and Remonstrance was the catalytic force occasioning the defeat in Virginia of an Assessment Bill designed to extract taxes in support of teachers of the Christian religion. See n. 28, infra. See also Everson v. Board of Education, 330 U. S. 1, 28, 33–41 (1947) (Rutledge, J., dissenting).

[2] Madison's often-quoted declaration is reprinted as an appendix to the dissenting opinions of Mr. Justice Rutledge and MR. JUSTICE DOUGLAS in Everson v. Board of Education, supra, at 63, 65, and Walz v. Tax Comm'n, 397 U. S. 664, 700, 719, 721 (1970), respectively.

[3] The provisions of the First Amendment have been made binding on the States through the Due Process Clause of the Fourteenth Amendment. See, e. g., Murdock v. Pennsylvania, 319 U. S. 105 (1943).

[4] Walz v. Tax Comm'n, supra, at 668. MR. CHIEF JUSTICE BURGER, writing for the Court, noted that the purpose of the Clauses "was to state an objective, not to write a statute," and that "[t]he Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." Id., at 668–669.

thoughtful scholarship by several of this Court's most respected former Justices, including Justices Black, Frankfurter, Harlan, Jackson, Rutledge, and Chief Justice Warren.

As a result of these decisions and opinions, it may no longer be said that the Religion Clauses are free of "entangling" precedents. Neither, however, may it be said that Jefferson's metaphoric "wall of separation" between Church and State has become "as winding as the famous serpentine wall" he designed for the University of Virginia. *McCollum* v. *Board of Education,* 333 U. S. 203, 238 (1948) (Jackson, J., concurring). Indeed, the controlling constitutional standards have become firmly rooted and the broad contours of our inquiry are now well defined. Our task, therefore, is to assess New York's several forms of aid in the light of principles already delineated.[5]

I

In May 1972, the Governor of New York signed into law several amendments to the State's Education and Tax Laws. The first five sections of these amendments established three distinct financial aid programs for non-

---

[5] The existence, at this stage of the Court's history, of guiding principles etched over the years in difficult cases does not, however, make our task today an easy one. For it is evident from the numerous opinions of the Court, and of Justices in concurrence and dissent in the leading cases applying the Establishment Clause, that no "bright line" guidance is afforded. Instead, while there has been general agreement upon the applicable principles and upon the framework of analysis, the Court has recognized its inability to perceive with invariable clarity the "lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon* v. *Kurtzman,* 403 U. S. 602, 612 (1971). And, at least where questions of entanglements are involved, the Court has acknowledged that, as of necessity, the "wall" is not without bends and may constitute a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Id.,* at 614.

public elementary and secondary schools. Almost immediately after the signing of these measures a complaint was filed in the United States District Court for the Southern District of New York challenging each of the three forms of aid as violative of the Establishment Clause. The plaintiffs were an unincorporated association, known as the Committee for Public Education and Religious Liberty (PEARL), and several individuals who were residents and taxpayers in New York, some of whom had children attending public schools. Named as defendants were the State Commissioner of Education, the Comptroller, and the Commissioner of Taxation and Finance. Motions to intervene on behalf of defendants were granted to a group of parents with children enrolled in nonpublic schools, and to the Majority Leader and President pro tem of the New York State Senate.[6] By consent of the parties, a three-judge court was convened pursuant to 28 U. S. C. §§ 2281 and 2283, and the case was decided without an evidentiary hearing. Because the questions before the District Court were resolved on the basis of the pleadings, that court's decision turned on the constitutionality of each provision on its face.

The first section of the challenged enactment, entitled "Health and Safety Grants for Nonpublic School Children," [7] provides for direct money grants from the State to "qualifying" nonpublic schools to be used for the "maintenance and repair of . . . school facilities and equipment to ensure the health, welfare and safety of enrolled pupils." [8] A "qualifying" school is any non-

---

[6] The motion was granted in favor of Mr. Earl W. Brydges. Upon his retirement in December 1972, his successor, Mr. Warren M. Anderson, was substituted.

[7] N. Y. Laws 1972, c. 414, § 1, amending N. Y. Educ. Law, Art. 12, §§ 549–553 (Supp. 1972–1973).

[8] *Id.*, § 550 (5).

public, nonprofit elementary or secondary school which "has been designated during the [immediately preceding] year as serving a high concentration of pupils from low-income families for purposes of Title IV of the Federal Higher Education Act of nineteen hundred sixty-five (20 U. S. C. A. § 425)." [9] Such schools are entitled to receive a grant of $30 per pupil per year, or $40 per pupil per year if the facilities are more than 25 years old. Each school is required to submit to the Commissioner of Education an audited statement of its expenditures for maintenance and repair during the preceding year, and its grant may not exceed the total of such expenses. The Commissioner is also required to ascertain the average per-pupil cost for equivalent maintenance and repair services in the public schools, and in no event may the grant to nonpublic qualifying schools exceed 50% of that figure.

"Maintenance and repair" is defined by the statute to include "the provision of heat, light, water, ventilation and sanitary facilities; cleaning, janitorial and custodial services; snow removal; necessary upkeep and renovation of buildings, grounds and equipment; fire and accident protection; and such other items as the commissioner may deem necessary to ensure the health, welfare and safety of enrolled pupils." [10] This section is prefaced by a series of legislative findings which shed light on the State's purpose in enacting the law. These findings conclude that the State "has a primary responsibility to ensure the health, welfare and safety of children attending . . . nonpublic schools"; that the "fiscal crisis in nonpublic education . . . has caused a diminution of proper maintenance and repair programs, threatening the health, welfare and safety of nonpublic school children"

---

[9] *Id.*, § 550 (2).
[10] *Id.*, § 550 (6).

in low-income urban areas; and that "a healthy and safe school environment" contributes "to the stability of urban neighborhoods." For these reasons, the statute declares that "the state has the right to make grants for maintenance and repair expenditures which are clearly secular, neutral and non-ideological in nature."[11]

The remainder of the challenged legislation—§§ 2 through 5—is a single package captioned the "Elementary and Secondary Education Opportunity Program." It is composed, essentially, of two parts, a tuition grant program and a tax benefit program. Section 2 establishes a limited plan providing tuition reimbursements to parents of children attending elementary or secondary nonpublic schools.[12] To qualify under this section a parent must have an annual taxable income of less than $5,000. The amount of reimbursement is limited to $50 for each grade school child and $100 for each high school child. Each parent is required, however, to submit to the Commissioner of Education a verified statement containing a receipted tuition bill, and the amount of state reimbursement may not exceed 50% of that figure. No restrictions are imposed on the use of the funds by the reimbursed parents.

This section, like § 1, is prefaced by a series of legislative findings designed to explain the impetus for the State's action. Expressing a dedication to the "vitality of our pluralistic society," the findings state that a "healthy competitive and diverse alternative to public education is not only desirable but indeed vital to a state and nation that have continually reaffirmed the value of individual differences."[13] The findings further emphasize that the

---

[11] *Id.,* § 549.

[12] N. Y. Laws 1972, c. 414, § 2, amending N. Y. Educ. Law, Art. 12–A, §§ 559–563 (Supp. 1972–1973).

[13] *Id.,* § 559 (1).

right to select among alternative educational systems "is diminished or even denied to children of lower-income families, whose parents, of all groups, have the least options in determining where their children are to be educated." [14] Turning to the public schools, the findings state that any "precipitous decline in the number of non-public school pupils would cause a massive increase in public school enrollment and costs," an increase that would "aggravate an already serious fiscal crisis in public education" and would "seriously jeopardize quality education for all children." [15] Based on these premises, the statute asserts the State's right to relieve the financial burden of parents who send their children to nonpublic schools through this tuition reimbursement program. Repeating the declaration contained in § 1, the findings conclude that "[s]uch assistance is clearly secular, neutral and nonideological." [16]

The remainder of the "Elementary and Secondary Education Opportunity Program," contained in §§ 3, 4, and 5 of the challenged law,[17] is designed to provide a form of tax relief to those who fail to qualify for tuition reimbursement. Under these sections parents may subtract from their adjusted gross income for state income tax purposes a designated amount for each dependent for whom they have paid at least $50 in nonpublic school tuition. If the taxpayer's adjusted gross income is less than $9,000 he may subtract $1,000 for each of as many as three dependents. As the taxpayer's income rises, the amount he may subtract diminishes. Thus, if a taxpayer has adjusted gross income of $15,000, he may subtract only $400 per dependent, and if his adjusted gross income is

[14] *Id.*, § 559 (2).

[15] *Id.*, § 559 (3).

[16] *Id.*, § 559 (4).

[17] N. Y. Laws 1972, c. 414, §§ 3, 4, and 5, amending N. Y. Tax Law §§ 612 (c), 612 (j) (Supp. 1972–1973).

$25,000 or more, no deduction is allowed.[18]   The amount of the deduction is not dependent upon how much the taxpayer actually paid for nonpublic school tuition, and is given in addition to any deductions to which the taxpayer may be entitled for other religious or charitable contributions.   As indicated in the memorandum from the Majority Leader and President pro tem of the Senate, submitted to each New York legislator during consideration of the bill, the actual tax benefits under these provisions were carefully calculated in advance.[19]   Thus, comparable tax

---

[18] Section 5 contains the following table:

| If New York adjusted gross income is: | The amount allowable for each dependent is: |
|---|---|
| Less than $9,000 | $1,000 |
| 9,000–10,999 | 850 |
| 11,000–12,999 | 700 |
| 13,000–14,999 | 550 |
| 15,000–16,999 | 400 |
| 17,000–18,999 | 250 |
| 19,000–20,999 | 150 |
| 21,000–22,999 | 125 |
| 23,000–24,999 | 100 |
| 25,000 and over | —0— |

N. Y. Tax Law § 612 (j) (1)  (Supp. 1972–1973).

[19] The following computations were submitted by Senator Brydges:

| If Adjusted Gross Income is | Estimated Net Benefit to Family | | |
|---|---|---|---|
| | One child | Two children | Three or more |
| less than $9,000 | $50.00 | $100.00 | $150.00 |
| 9,000–10,999 | 42.50 | 85.00 | 127.50 |
| 11,000–12,999 | 42.00 | 84.00 | 126.00 |
| 13,000–14,999 | 38.50 | 77.00 | 115.50 |
| 15,000–16,999 | 32.00 | 64.00 | 96.00 |
| 17,000–18,999 | 22.50 | 45.00 | 67.50 |
| 19,000–20,999 | 15.00 | 30.00 | 45.00 |
| 21,000–22,999 | 13.75 | 27.50 | 41.25 |
| 23,000–24,999 | 12.00 | 24.00 | 36.00 |
| 25,000 and over | 0 | 0 | 0 |

benefits pick up at approximately the point at which tuition reimbursement benefits leave off.

While the scheme of the enactment indicates that the purposes underlying the promulgation of the tuition reimbursement program should be regarded as pertinent as well to these tax law sections, § 3 does contain an additional series of legislative findings. Those findings may be summarized as follows: (i) contributions to religious, charitable and educational institutions are already deductible from gross income; (ii) nonpublic educational institutions are accorded tax exempt status; (iii) such institutions provide education for children attending them and also serve to relieve the public school systems of the burden of providing for their education; and, therefore, (iv) the "legislature . . . finds and determines that similar modifications . . . should also be provided to parents for tuition paid to nonpublic elementary and secondary schools on behalf of their dependents." [20]

Although no record was developed in these cases, a number of pertinent generalizations may be made about the nonpublic schools which would benefit from these enactments. The District Court, relying on findings in a similar case recently decided by the same court,[21] adopted a profile of these sectarian, nonpublic schools similar to the one suggested in the plaintiffs' complaint. Qualifying institutions, under all three segments of the enactment, could be ones that

> "(a) impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doc-

---

[20] N. Y. Tax Law § 612 (Supp. 1972–1973) (accompanying notes).

[21] *Committee for Public Education & Religious Liberty* v. *Levitt,* 342 F. Supp. 439, 440–441 (SDNY 1972), aff'd, *ante,* p. 472.

trine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach." 350 F. Supp. 655, 663.

Of course, the characteristics of individual schools may vary widely from that profile. Some 700,000 to 800,000 students, constituting almost 20% of the State's entire elementary and secondary school population, attend over 2,000 nonpublic schools, approximately 85% of which are church affiliated. And while "all or practically all" of the 280 schools [22] entitled to receive "maintenance and repair" grants "are related to the Roman Catholic Church and teach Catholic religious doctrine to some degree," *id.*, at 661, institutions qualifying under the remainder of the statute include a substantial number of Jewish, Lutheran, Episcopal, Seventh Day Adventist, and other church-affiliated schools.[23]

Plaintiffs argued below that because of the substantially religious character of the intended beneficiaries, each of the State's three enactments offended the Establishment Clause. The District Court, in an opinion carefully canvassing this Court's recent precedents, held

---

[22] As indicated in the District Court's opinion, it has been estimated that 280 schools would qualify for such grants. The relevant criteria for determining eligibility are set out in 20 U. S. C. § 425, and the central test is whether the school is one "in which there is a high concentration of students from low-income families."

[23] In the fall of 1968, there were 2,038 nonpublic schools in New York State; 1,415 Roman Catholic; 164 Jewish; 59 Lutheran; 49 Episcopal; 37 Seventh Day Adventist; 18 other church affiliated; 296 without religious affiliation. N. Y. State Educ. Dept., Financial Support—Nonpublic Schools 3 (1969).

unanimously that § 1 (maintenance and repair grants) and § 2 (tuition reimbursement grants) were invalid. As to the income tax provisions of §§ 3, 4, and 5, however, a majority of the District Court, over the dissent of Circuit Judge Hays, held that the Establishment Clause had not been violated. Finding the provisions of the law severable, it enjoined permanently any further implementation of §§ 1 and 2 but declared the remainder of the law independently enforceable. The plaintiffs (hereinafter appellants) appealed directly to this Court, challenging the District Court's adverse decision as to the third segment of the statute.[24] The defendant state officials (hereinafter appellees) have appealed so much of the court's decision as invalidates the first and second portions of the 1972 law,[25] the intervenor Majority Leader and President pro tem of the Senate (hereinafter appellee or intervenor) has also appealed from those aspects of the lower court's opinion,[26] and the intervening parents of nonpublic schoolchildren (hereinafter appellee or intervenor) have appealed only from the decision as to § 2.[27] This Court noted probable jurisdiction over each appeal and ordered the cases consolidated for oral argument. 410 U. S. 907 (1973). Thus, the constitutionality of each of New York's recently promulgated aid provisions is squarely before us. We affirm the District Court insofar as it struck down §§ 1 and 2 and reverse its determination regarding §§ 3, 4, and 5.

[24] No. 72–694, *Committee for Public Education & Religious Liberty* v. *Nyquist*.

[25] No. 72–791, *Nyquist* v. *Committee for Public Education & Religious Liberty*.

[26] No. 72–753, *Anderson* v. *Committee for Public Education & Religious Liberty*.

[27] No. 72–929, *Cherry* v. *Committee for Public Education & Religious Liberty*.

## II

The history of the Establishment Clause has been recounted frequently and need not be repeated here. See *Everson* v. *Board of Education,* 330 U. S. 1 (1947); *id.,* at 28 (Rutledge, J., dissenting); [28] *McCollum* v. *Board*

[28] Virginia's experience, examined at length in the majority and dissenting opinions in *Everson,* constitutes one of the greatest chapters in the history of this country's adoption of the essentially revolutionary notion of separation between Church and State. During the Colonial Era and into the late 1700's, the Anglican Church appeared firmly seated as the established church of Virginia. But in 1776, assisted by the persistent efforts of Baptists, Presbyterians, and Lutherans, the Virginia Convention approved a provision for its first constitution's Bill of Rights calling for the free exercise of religion. The provision, drafted by George Mason and substantially amended by James Madison, stated "[t]hat religion . . . and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore, all men are equally entitled to the free exercise of religion according to the dictates of conscience . . . ."

But the Virginia Bill of Rights contained no prohibition against the Establishment of Religion, and the next eight years were marked by debate over the relationship between Church and State. In 1784, a bill sponsored principally by Patrick Henry, entitled A Bill Establishing a Provision for Teachers of the Christian Religion, was brought before the Virginia Assembly. The Bill, reprinted in full as an Appendix to Mr. Justice Rutledge's dissenting opinion in *Everson* v. *Board of Education,* 330 U. S. 1, 72–74 (1947), required all persons to pay an annual tax "for the support of Christian teachers" in order that the teaching of religion might be promoted. Each taxpayer was permitted under the Bill to declare which church he desired to receive his share of the tax. The Bill was not voted on during the 1784 session, and prior to the convening of the 1785 session Madison penned his Memorial and Remonstrance against Religious Assessments, outlining in 15 numbered paragraphs the reasons for his opposition to the Assessments Bill. The document was widely circulated and inspired such overwhelming opposition to the Bill that it died during the ensuing session without reaching a vote. Madison's Memorial and Remonstrance, recognized today as

*of Education,* 333 U. S., at 212 (separate opinion of Frankfurter, J.) ; *McGowan* v. *Maryland,* 366 U. S. 420 (1961) ; *Engel* v. *Vitale,* 370 U. S. 421 (1962). It is enough to note that it is now firmly established that a law may be one "respecting an establishment of religion" even though its consequence is not to promote a "state religion," *Lemon* v. *Kurtzman,* 403 U. S. 602, 612 (1971), and even though it does not aid one religion more than another but merely benefits all religions alike. *Everson* v. *Board of Education, supra,* at 15. It is equally well established, however, that not every law that confers an "indirect," "remote," or "incidental" benefit upon religious institutions is, for that reason alone, constitutionally invalid. *Everson, supra; McGowan* v. *Maryland,*

---

one of the cornerstones of the First Amendment's guarantee of government neutrality toward religion, also provided the necessary foundation for the immediate consideration and adoption of Thomas Jefferson's Bill for Establishing Religious Freedom, which contained Virginia's first acknowledgment of the principle of total separation of Church and State. The core of that principle, as stated in the Bill, is that "no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever . . . ." In Jefferson's perspective, so vital was this "wall of separation" to the perpetuation of democratic institutions that it was this Bill, along with his authorship of the Declaration of Independence and the founding of the University of Virginia, that he wished to have inscribed on his tombstone. Report of the Comm'n on Constitutional Revision, The Constitution of Virginia 100–101 (1969).

Both Madison's Bill of Rights provision on the free exercise of religion and Jefferson's Bill for Establishing Religious Freedom have remained in the Virginia Constitution, unaltered in substance, throughout that State's history. See Va. Const., Art. I, § 16, in which the two guarantees have been brought together in a single provision. For comprehensive discussions of the pertinent Virginia history, see S. Cobb, The Rise of Religious Liberty in America 74–115, 490–499 (reprinted 1970) ; C. James, The Struggle for Religious Liberty in Virginia (1900) ; I. Brant, James Madison The Nationalist 1780–1787, pp. 343–355 (1948).

*supra,* at 450; *Walz* v. *Tax Comm'n,* 397 U. S. 664, 671–672, 674–675 (1970). What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz* v. *Tax Comm'n, supra,* at 668; *Lemon* v. *Kurtzman, supra,* at 612.

Most of the cases coming to this Court raising Establishment Clause questions have involved the relationship between religion and education. Among these religion-education precedents, two general categories of cases may be identified: those dealing with religious activities within the public schools,[29] and those involving public aid in varying forms to sectarian educational institutions.[30] While the New York legislation places this case in the latter category, its resolution requires consideration not only of the several aid-to-sectarian-education cases, but also of our other education precedents and of several important noneducation cases. For the now well-defined three-part test that has emerged from our decisions is a product of considerations derived from the full sweep of the Establishment Clause cases. Taken together,

---

[29] *McCollum* v. *Board of Education,* 333 U. S. 203 (1948) ("release time" from public education for religious education); *Zorach* v. *Clauson,* 343 U. S. 306 (1952) (also a "release time" case); *Engel* v. *Vitale,* 370 U. S. 421 (1962) (prayer reading in public schools); *School District of Abington Township* v. *Schempp,* 374 U. S. 203 (1963) (Bible reading in public schools); *Epperson* v. *Arkansas,* 393 U. S. 97 (1968) (anti-evolutionary limitation on public school study).

[30] *Everson* v. *Board of Education, supra* (bus transportation); *Board of Education* v. *Allen,* 392 U. S. 236 (1968) (textbooks); *Lemon* v. *Kurtzman, supra* (teachers' salaries, textbooks, instructional materials); *Earley* v. *DiCenso,* 403 U. S. 602 (1971) (teachers' salaries); *Tilton* v. *Richardson,* 403 U. S. 672 (1971) (secular college facilities).

these decisions dictate that to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, *e. g., Epperson* v. *Arkansas,* 393 U. S. 97 (1968), second, must have a primary effect that neither advances nor inhibits religion, *e. g., McGowan* v. *Maryland, supra; School District of Abington Township* v. *Schempp,* 374 U. S. 203 (1963), and, third, must avoid excessive government entanglement with religion, *e. g., Walz* v. *Tax Comm'n, supra.* See *Lemon* v. *Kurtzman, supra,* at 612–613; *Tilton* v. *Richardson,* 403 U. S. 672, 678 (1971).[31]

In applying these criteria to the three distinct forms of aid involved in this case, we need touch only briefly on the requirement of a "secular legislative purpose." As the recitation of legislative purposes appended to New York's law indicates, each measure is adequately supported by legitimate, nonsectarian state interests. We do not question the propriety, and fully secular content, of New York's interest in preserving a healthy and safe educational environment for all of its schoolchildren. And we do not doubt—indeed, we fully recognize—the validity of the State's interests in promoting pluralism and diversity among its public and nonpublic schools. Nor do we hesitate to acknowledge the reality of its concern for an already overburdened public school system that might suffer in the event that a significant percentage of children presently attending nonpublic schools should abandon those schools in favor of the public schools.

---

[31] In discussing the application of these "tests," MR. CHIEF JUSTICE BURGER noted in *Tilton* v. *Richardson, supra,* that "there is no single constitutional caliper that can be used to measure the precise degree" to which any one of them is applicable to the state action under scrutiny. Rather, these tests or criteria should be "viewed as guidelines" within which to consider "the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause." *Id.,* at 677–678.

But the propriety of a legislature's purposes may not immunize from further scrutiny a law which either has a primary effect that advances religion, or which fosters excessive entanglements between Church and State. Accordingly, we must weigh each of the three aid provisions challenged here against these criteria of effect and entanglement.

## A

The "maintenance and repair" provisions of § 1 authorize direct payments to nonpublic schools, virtually all of which are Roman Catholic schools in low-income areas. The grants, totaling $30 or $40 per pupil depending on the age of the institution, are given largely without restriction on usage. So long as expenditures do not exceed 50% of comparable expenses in the public school system, it is possible for a sectarian elementary or secondary school to finance its entire "maintenance and repair" budget from state tax-raised funds. No attempt is made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes, nor do we think it possible within the context of these religion-oriented institutions to impose such restrictions. Nothing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities. Absent appropriate restrictions on expenditures for these and similar purposes, it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools.

The state officials nevertheless argue that these expenditures for "maintenance and repair" are similar to other financial expenditures approved by this Court.

Primarily they rely on *Everson* v. *Board of Education, supra; Board of Education* v. *Allen,* 392 U. S. 236 (1968) ; and *Tilton* v. *Richardson, supra.* In each of those cases it is true that the Court approved a form of financial assistance which conferred undeniable benefits upon private, sectarian schools. But a close examination of those cases illuminates their distinguishing characteristics. In *Everson,* the Court, in a five-to-four decision, approved a program of reimbursements to parents of public as well as parochial schoolchildren for bus fares paid in connection with transportation to and from school, a program which the Court characterized as approaching the "verge" of impermissible state aid. 330 U. S., at 16. In *Allen,* decided some 20 years later, the Court upheld a New York law authorizing the provision of *secular* textbooks for all children in grades seven through 12 attending public and nonpublic schools. Finally, in *Tilton,* the Court upheld federal grants of funds for the construction of facilities to be used for clearly *secular* purposes by public and nonpublic institutions of higher learning.

These cases simply recognize that sectarian schools perform secular, educational functions as well as religious functions, and that some forms of aid may be channeled to the secular without providing direct aid to the sectarian. But the channel is a narrow one, as the above cases illustrate. Of course, it is true in each case that the provision of such neutral, nonideological aid, assisting only the secular functions of sectarian schools, served indirectly and incidentally to promote the religious function by rendering it more likely that children would attend sectarian schools and by freeing the budgets of those schools for use in other nonsecular areas. But an indirect and incidental effect beneficial to religious institutions has never been thought a sufficient defect to warrant the invalidation of a state law. In *McGowan* v. *Maryland,*

*supra,* Sunday Closing Laws were sustained even though one of their undeniable effects was to render it somewhat more likely that citizens would respect religious institutions and even attend religious services. Also, in *Walz* v. *Tax Comm'n, supra,* property tax exemptions for church property were held not violative of the Establishment Clause despite the fact that such exemptions relieved churches of a financial burden.

*Tilton* draws the line most clearly. While a bare majority was there persuaded, for the reasons stated in the plurality opinion and in Mr. Justice White's concurrence, that carefully limited construction grants to colleges and universities could be sustained, the Court was unanimous in its rejection of one clause of the federal statute in question. Under that clause, the Government was entitled to recover a portion of its grant to a sectarian institution in the event that the constructed facility was used to advance religion by, for instance, converting the building to a chapel or otherwise allowing it to be "used to promote religious interests." 403 U. S., at 683. But because the statute provided that the condition would expire at the end of 20 years, the facilities would thereafter be available for use by the institution for any sectarian purpose. In striking down this provision, the plurality opinion emphasized that "[l]imiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period." *Ibid.* And in that event, "the original federal grant will in part have the effect of advancing religion." *Ibid.* See also *id.,* at 692 (Douglas, J., dissenting in part), 659–661 (separate opinion of Brennan, J.), 665 n. 1 (White, J., concurring in judgment). If tax-raised funds may not be granted to institutions of higher learning where the possibility exists that those funds will be used to construct a facility utilized for sectarian activities 20 years hence, *a fortiori* they

may not be distributed to elementary and secondary sectarian schools [32] for the maintenance and repair of facilities without any limitations on their use. If the State may not erect buildings in which religious activities are to take place, it may not maintain such buildings or renovate them when they fall into disrepair.[33]

It might be argued, however, that while the New York "maintenance and repair" grants lack specifically articulated secular restrictions, the statute does provide a sort of statistical guarantee of separation by limiting grants to 50% of the amount expended for comparable services in the public schools. The legislature's supposition might have been that at least 50% of the ordinary public school maintenance and repair budget would be devoted to purely secular facility upkeep in sectarian schools. The shortest answer to this argument is that the statute itself allows, as a ceiling, grants satisfying the entire "amount of expenditures for maintenance and repair of such school" providing only that it is neither more than $30 or $40 per pupil nor more than 50% of the comparable

---

[32] The plurality in *Tilton* was careful to point out that there are "significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools." 403 U. S., at 685. See *Hunt* v. *McNair, ante,* p. 734.

[33] Our Establishment Clause precedents have recognized the special relevance in this area of Mr. Justice Holmes' comment that "a page of history is worth a volume of logic." See *Walz* v. *Tax Comm'n,* 397 U. S., at 675–676 (citing *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921)). In *Everson,* Mr. Justice Black surveyed the history of state involvement in, and support of, religion during the pre-Revolutionary period and concluded:

"These practices became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence. The imposition of taxes to pay ministers' salaries and to build and *maintain* churches and church property aroused their indignation. It was these feelings which found expression in the First Amendment." 330 U. S., at 11 (emphasis supplied).

public school expenditures.[34]   Quite apart from the language of the statute, our cases make clear that a mere statistical judgment will not suffice as a guarantee that state funds will not be used to finance religious education. In *Earley* v. *DiCenso,* a companion case to *Lemon* v. *Kurtzman, supra,* the Court struck down a Rhode Island law authorizing salary supplements to teachers of secular subjects.   The grants were not to exceed 15% of any teacher's annual salary.   Although the law was invalidated on entanglement grounds, the Court made clear that the State could not have avoided violating the Establishment Clause by merely assuming that its teachers would succeed in segregating "their religious beliefs from their secular educational responsibilities."   403 U. S., at 619.

> "The Rhode Island Legislature has not, *and could not,* provide state aid on the basis of a mere assumption that secular teachers under religious discipline

---

[34] The pertinent section reads as follows:

"In order to meet proper health, welfare and safety standards in qualifying schools for the benefit of the pupils enrolled therein, there shall be apportioned health, welfare and safety grants by the commissioner to each qualifying school for the school years beginning on and after July first, nineteen hundred seventy-one, an amount equal to the product of thirty dollars multiplied by the average daily attendance of pupils receiving instruction in such school, to be applied for costs of maintenance and repair.   Such apportionment shall be increased by ten dollars multiplied by the average daily attendance of pupils receiving instruction in a school building constructed prior to nineteen hundred forty-seven. *In no event shall the per pupil annual allowance computed under this section exceed fifty per centum of the average per pupil cost of equivalent maintenance and repair in the public schools of the state on a state-wide basis, as determined by the commissioner, and in no event shall the apportionment to a qualifying school exceed the amount of expenditures for maintenance and repair of such school as reported pursuant to section five hundred fifty-two of this article."* N. Y. Educ. Law, Art. 12, § 551 (Supp. 1972–1973) (emphasis supplied).

can avoid conflicts. The State *must be certain, given the Religion Clauses,* that subsidized teachers do not inculcate religion . . . ." *Ibid.*[35] (Emphasis supplied.)

Nor could the State of Rhode Island have prevailed by simply relying on the assumption that, whatever a secular teacher's inabilities to refrain from mixing the religious with the secular, he would surely devote at least 15% of his efforts to purely secular education, thus exhausting the state grant. It takes little imagination to perceive the extent to which States might openly subsidize parochial schools under such a loose standard of scrutiny. See also *Tilton* v. *Richardson, supra.*[36]

What we have said demonstrates that New York's maintenance and repair provisions violate the Establishment Clause because their effect, inevitably, is to subsidize and advance the religious mission of sectarian

---

[35] Elsewhere in the opinion, the Court emphasized the necessity for the States of Rhode Island and Pennsylvania to assure, through careful regulation, the secularity of their grants:

"The two legislatures . . . have also recognized that church-related elementary and secondary schools have a significant religious mission and that a substantial portion of their activities is religiously oriented. They have therefore sought to create statutory restrictions designed to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former. All these provisions are precautions taken in candid recognition that these programs approached, even if they did not intrude upon, the forbidden areas under the Religion Clauses." 403 U. S., at 613.

[36] In *Tilton,* federal construction grants were limited to paying 50% of the cost of erecting any secular facility. In striking from the law the 20-year limitation, the Court was concerned lest *any* federally financed facility be used for religious purposes *at any time.* It was plainly not concerned only that at least 50% of the facility, or 50% of its life, be devoted to secular activities. Had this been the test there can be little doubt that the 20-year restriction would have been adequate.

schools. We have no occasion, therefore, to consider the further question whether those provisions as presently written would also fail to survive scrutiny under the administrative entanglement aspect of the three-part test because assuring the secular use of all funds requires too intrusive and continuing a relationship between Church and State, *Lemon* v. *Kurtzman, supra.*

## B

New York's tuition reimbursement program also fails the "effect" test, for much the same reasons that govern its maintenance and repair grants. The state program is designed to allow direct, unrestricted grants of $50 to $100 per child (but no more than 50% of tuition actually paid) as reimbursement to parents in low-income brackets who send their children to nonpublic schools, the bulk of which is concededly sectarian in orientation. To qualify, a parent must have earned less than $5,000 in taxable income and must present a receipted tuition bill from a nonpublic school.

There can be no question that these grants could not, consistently with the Establishment Clause, be given directly to sectarian schools, since they would suffer from the same deficiency that renders invalid the grants for maintenance and repair. In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid. As Mr. Justice Black put it quite simply in *Everson:*

> "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." 330 U. S., at 16.

The controlling question here, then, is whether the fact that the grants are delivered to parents rather than schools is of such significance as to compel a contrary result. The State and intervenor-appellees rely on *Everson* and *Allen* for their claim that grants to parents, unlike grants to institutions, respect the "wall of separation" required by the Constitution.[37] It is true that in those cases the Court upheld laws that provided benefits to children attending religious schools and to their parents: As noted above, in *Everson* parents were reimbursed for bus fares paid to send children to parochial schools, and in *Allen* textbooks were loaned directly to the children. But those decisions make clear that, far from providing a *per se* immunity from examination of the substance of the State's program, the fact that aid is disbursed to parents rather than to the schools is only one among many factors to be considered.

In *Everson,* the Court found the bus fare program analogous to the provision of services such as police and fire protection, sewage disposal, highways, and sidewalks for parochial schools. 330 U. S., at 17–18. Such services,

---

[37] In addition to *Everson* and *Allen,* THE CHIEF JUSTICE in his dissenting opinion relies on *Quick Bear* v. *Leupp,* 210 U. S. 50 (1908), for the proposition that "government aid to individuals generally stands on an entirely different footing from direct aid to religious institutions." *Post,* at 801. *Quick Bear,* however, did not involve the expenditure of tax-raised moneys to support sectarian schools. The funds that were utilized by the Indians to provide sectarian education were treaty and trust funds which the Court emphasized belonged to the Indians as payment for the cession of Indian land and other rights. 210 U. S., at 80–81. It was their money, and the Court held that for Congress to have prohibited them from expending their own money to acquire a religious education would have constituted a prohibition of the free exercise of religion. *Id.,* at 82. The present litigation is quite unlike *Quick Bear* since that case did not involve the distribution of public funds, directly or indirectly, to compensate parents who send their children to religious schools.

provided in common to all citizens, are "so separate and so indisputably marked off from the religious function," *id.*, at 18, that they may fairly be viewed as reflections of a neutral posture toward religious institutions. *Allen* is founded upon a similar principle. The Court there repeatedly emphasized that upon the record in that case there was no indication that textbooks would be provided for anything other than purely secular courses. "Of course books are different from buses. Most bus rides have no inherent religious significance, while religious books are common. However, the language of [the law under consideration] does not authorize the loan of religious books, and the State claims no right to distribute religious literature. . . . Absent evidence, we cannot assume that school authorities . . . are unable to distinguish between secular and religious books or that they will not honestly discharge their duties under the law." 392 U. S., at 244–245.[38]

---

[38] *Allen* and *Everson* differ from the present litigation in a second important respect. In both cases the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools. See also *Tilton* v. *Richardson, supra,* in which federal aid was made available to *all* institutions of higher learning, and *Walz* v. *Tax Comm'n, supra,* in which tax exemptions were accorded to *all* educational and charitable nonprofit institutions. We do not agree with the suggestion in the dissent of The Chief Justice that tuition grants are an analogous endeavor to provide comparable benefits to all parents of schoolchildren whether enrolled in public or nonpublic schools. *Post,* at 801–803. The grants to parents of private school children are given in addition to the right that they have to send their children to public schools "totally at state expense." And in any event, the argument proves too much, for it would also provide a basis for approving through tuition grants the *complete subsidization* of all religious schools on the ground that such action is necessary if the State is fully to equalize the position of parents who elect such schools—a result wholly at variance with the Establishment Clause.

Because of the manner in which we have resolved the tuition grant

The tuition grants here are subject to no such restrictions. There has been no endeavor "to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former." *Lemon* v. *Kurtzman, supra,* at 613. Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid—to perpetuate a pluralistic educational environment and to protect the fiscal integrity of overburdened public schools—are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions.[39]

---

issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (*e. g.,* scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited. See *Wolman* v. *Essex,* 342 F. Supp. 399, 412–413 (SD Ohio), aff'd, 409 U. S. 808 (1972). Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the "G. I. Bill," 38 U. S. C. § 1651, impermissibly advance religion in violation of the Establishment Clause. See also n. 32, *supra.*

[39] Appellees, focusing on the term "principal or primary effect" which this Court has utilized in expressing the second prong of the three-part test, *e. g., Lemon* v. *Kurtzman, supra,* at 612, have argued that the Court must decide in these cases whether the "primary" effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. MR. JUSTICE WHITE's dissenting opinion, *post,* at 823, similarly suggests that the Court today fails to make this "ultimate judgment." We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have

Mr. Justice Black, dissenting in *Allen,* warned that

"[i]t requires no prophet to foresee that on the argument used to support this law others could be up-

---

a "primary" effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. In *McGowan* v. *Maryland,* 366 U. S. 420 (1961), Sunday Closing Laws were upheld, not because their effect was, first, to promote the legitimate interest in a universal day of rest and recreation and only secondarily to assist religious interests; instead, approval flowed from the finding, based upon a close examination of the history of such laws, that they had only a remote and incidental effect advantageous to religious institutions. *Id.,* at 450. See also *Gallagher* v. *Crown Kosher Super Market,* 366 U. S. 617, 630 (1961); *Two Guys from Harrison-Allentown, Inc.* v. *McGinley,* 366 U. S. 582, 598 (1961). Likewise, in *Schempp* the school authorities argued that Bible-reading and other religious recitations in public schools served, primarily, secular purposes, including "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." 374 U. S., at 223. Yet, without discrediting these ends and without determining whether they took precedence over the direct religious benefit, the Court held such exercises incompatible with the Establishment Clause. See also *id.,* at 278–281 (BRENNAN, J., concurring). Any remaining question about the contours of the "effect" criterion were resolved by the Court's decision in *Tilton,* in which the plurality found that the mere possibility that a federally financed structure might be used for religious purposes 20 years hence was constitutionally unacceptable because the grant might *"in part* have the effect of advancing religion." 403 U. S., at 683 (emphasis supplied).

It may assist in providing a historical perspective to recall that the argument here is not a new one. The Preamble to Patrick Henry's Bill Establishing a Provision for Teachers of the Christian Religion, which would have required Virginians to pay taxes to support religious teachers and which became the focal point of Madison's Memorial and Remonstrance, see n. 28, *supra,* contained the following listing of secular purposes:

"[T]he general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve

> held providing for state or federal government funds to buy property on which to erect religious school buildings or to erect the buildings themselves, to pay the salaries of the religious school teachers, and finally to have the sectarian religious groups cease to rely on voluntary contributions of members of their sects while waiting for the Government to pick up all the bills for the religious schools." 392 U. S., at 253.

His fears regarding religious buildings and religious teachers have not come to pass, *Tilton* v. *Richardson, supra; Lemon* v. *Kurtzman, supra,* and insofar as tuition grants constitute a means of "pick[ing] up . . . the bills for the religious schools," neither has his greatest fear materialized. But the ingenious plans for channeling state aid to sectarian schools that periodically reach this Court abundantly support the wisdom of Mr. Justice Black's prophecy.

Although we think it clear, for the reasons above stated, that New York's tuition grant program fares no better under the "effect" test than its maintenance and repair program, in view of the novelty of the question we will address briefly the subsidiary arguments made by the state officials and intervenors in its defense.

First, it has been suggested that it is of controlling significance that New York's program calls for *reimbursement* for tuition already paid rather than for direct contributions which are merely routed through the parents to the schools, in advance of or in lieu of payment

---

the peace of society . . . ." *Everson* v. *Board of Education,* 330 U. S., at 72 (Appendix to dissent of Rutledge, J.).

Such secular objectives, no matter how desirable and irrespective of whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify such a direct and substantial advancement of religion.

by the parents. The parent is not a mere conduit, we are told, but is absolutely free to spend the money he receives in any manner he wishes. There is no element of coercion attached to the reimbursement, and no assurance that the money will eventually end up in the hands of religious schools. The absence of any element of coercion, however, is irrelevant to questions arising under the Establishment Clause. In *School District of Abington Township* v. *Schempp, supra,* it was contended that Bible recitations in public schools did not violate the Establishment Clause because participation in such exercises was not coerced. The Court rejected that argument, noting that while proof of coercion might provide a basis for a claim under the Free Exercise Clause, it was not a necessary element of any claim under the Establishment Clause. 374 U. S., at 222–223. MR. JUSTICE BRENNAN's concurring views reiterated the Court's conclusion:

> "Thus the short, and to me sufficient, answer is that the availability of excusal or exemption simply has no relevance to the establishment question, if it is once found that these practices are essentially religious exercises designed at least in part to achieve religious aims . . . ." *Id.,* at 288.

A similar inquiry governs here: if the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions.[40] Whether the grant is labeled a reimbursement, a reward, or a subsidy, its substantive impact is still the same. In sum, we agree with

---

[40] The forms of aid involved in *Everson, Earley* v. *DiCenso,* and *Lemon,* were all given as "reimbursement," yet not one line in any of those cases suggests that this factor was of any constitutional significance.

the conclusion of the District Court that "[w]hether he gets it during the current year, or as reimbursement for the past year, is of no constitutional importance." 350 F. Supp., at 668.

Second, the Majority Leader and President pro tem of the State Senate argues that it is significant here that the tuition reimbursement grants pay only a portion of the tuition bill, and an even smaller portion of the religious school's total expenses. The New York statute limits reimbursement to 50% of any parent's actual outlay. Additionally, intervenor estimates that only 30% of the total cost of nonpublic education is covered by tuition payments, with the remaining coming from "voluntary contribution, endowments and the like." [41] On the basis of these two statistics, appellees reason that the "maximum tuition reimbursement by the State is thus only 15% of educational costs in the nonpublic schools." [42] And, "since the compulsory education laws of the State, by necessity require significantly more than 15% of school time to be devoted to teaching secular courses," the New York statute provides "a statistical guarantee of neutrality." [43] It should readily be seen that this is simply another variant of the argument we have rejected as to maintenance and repair costs, *supra*, at 777–779, and it can fare no better here. Obviously, if accepted, this argument would provide the foundation for massive, direct subsidization of sectarian elementary and secondary schools. [44] Our cases, however, have long since foreclosed

[41] Brief for Appellee Anderson 25.

[42] *Ibid.*

[43] *Ibid.*

[44] None of the three dissenting opinions filed today purports to rely on any such statistical assurances of secularity. Indeed, under the rationale of those opinions, it is difficult to perceive any limitations on the amount of state aid that would be approved in the form of tuition grants.

the notion that mere statistical assurances will suffice to sail between the Scylla and Charybdis of "effect" and "entanglement."

Finally, the State argues that its program of tuition grants should survive scrutiny because it is designed to promote the free exercise of religion. The State notes that only "low-income parents" are aided by this law, and without state assistance their right to have their children educated in a religious environment "is diminished or even denied." [45] It is true, of course, that this Court has long recognized and maintained the right to choose nonpublic over public education. *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). It is also true that a state law interfering with a parent's right to have his child educated in a sectarian school would run afoul of the Free Exercise Clause. But this Court repeatedly has recognized that tension inevitably exists between the Free Exercise and the Establishment Clauses, *e. g., Everson* v. *Board of Education, supra; Walz* v. *Tax Comm'n, supra,* and that it may often not be possible to promote the former without offending the latter. As a result of this tension, our cases require the State to maintain an attitude of "neutrality," neither "advancing" nor "inhibiting" religion.[46] In its attempt to enhance the opportunities of the poor to choose between public and nonpublic education, the State has taken a step which can only be regarded as one "advancing" religion. However great our sympathy, *Everson* v. *Board of Education,* 330 U. S., at 18 (Jackson, J., dissenting), for the burdens experienced by those who must pay public school taxes at the same time that they support other schools because

---

[45] N. Y. Educ. Law, Art. 12–A, § 559 (2) (Supp. 1972–1973) (legislative finding supporting tuition reimbursement).

[46] "[T]he basic purpose of these provisions . . . is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz* v. *Tax Comm'n,* 397 U. S., at 669.

of the constraints of "conscience and discipline," *ibid.*, and notwithstanding the "high social importance" of the State's purposes, *Wisconsin* v. *Yoder,* 406 U. S. 205, 214 (1972), neither may justify an eroding of the limitations of the Establishment Clause now firmly emplanted.

## C

Sections 3, 4, and 5 establish a system for providing income tax benefits to parents of children attending New York's nonpublic schools. In this Court, the parties have engaged in a considerable debate over what label best fits the New York law. Appellants insist that the law is, in effect, one establishing a system of tax "credits." The State and the intervenors reject that characterization and would label it, instead, a system of income tax "modifications." The Solicitor General, in an *amicus curiae* brief filed in this Court, has referred throughout to the New York law as one authorizing tax "deductions." The District Court majority found that the aid was "in effect a tax *credit,*" 350 F. Supp., at 672 (emphasis in original). Because of the peculiar nature of the benefit allowed, it is difficult to adopt any single traditional label lifted from the law of income taxation. It is, at least in its form, a tax deduction since it is an amount subtracted from adjusted gross income, prior to computation of the tax due. Its effect, as the District Court concluded, is more like that of a tax credit since the deduction is not related to the amount actually spent for tuition and is apparently designed to yield a predetermined amount of tax "forgiveness" in exchange for performing a specific act which the State desires to encourage—the usual attribute of a tax credit. We see no reason to select one label over another, as the constitutionality of this hybrid benefit does not turn in any event on the label we accord it. As MR. CHIEF JUSTICE BURGER's opinion for the Court in *Lemon* v. *Kurtzman,* 403 U. S., at 614, notes, constitu-

tional analysis is not a "legalistic minuet in which precise rules and forms must govern." Instead we must "examine the form of the relationship for the light that it casts on the substance."

These sections allow parents of children attending nonpublic elementary and secondary schools to subtract from adjusted gross income a specified amount if they do not receive a tuition reimbursement under § 2, and if they have an adjusted gross income of less than $25,000. The amount of the deduction is unrelated to the amount of money actually expended by any parent on tuition, but is calculated on the basis of a formula contained in the statute.[47] The formula is apparently the product of a legislative attempt to assure that each family would receive a carefully estimated net benefit, and that the tax benefit would be comparable to, and compatible with, the tuition grant for lower income families. Thus, a parent who earns less than $5,000 is entitled to a tuition reimbursement of $50 if he has one child attending an elementary, nonpublic school, while a parent who earns more (but less than $9,000) is entitled to have a precisely equal amount taken off his tax bill.[48] Additionally, a taxpayer's benefit under these sections is unrelated to, and not reduced by, any deductions to which he may be entitled for charitable contributions to religious institutions.[49]

In practical terms there would appear to be little difference, for purposes of determining whether such aid has the effect of advancing religion, between the tax

---

[47] See n. 18, *supra.*

[48] The estimated-benefit table is reprinted in n. *19, supra.*

[49] Since the program here does not have the elements of a genuine tax deduction, such as for charitable contributions, we do not have before us, and do not decide, whether that form of tax benefit is constitutionally acceptable under the "neutrality" test in *Walz.*

benefit allowed here and the tuition grant allowed under § 2. The qualifying parent under either program receives the same form of encouragement and reward for sending his children to nonpublic schools. The only difference is that one parent receives an actual cash payment while the other is allowed to reduce by an arbitrary amount the sum he would otherwise be obliged to pay over to the State. We see no answer to Judge Hays' dissenting statement below that "[i]n both instances the money involved represents a charge made upon the state for the purpose of religious education." 350 F. Supp., at 675.

Appellees defend the tax portion of New York's legislative package on two grounds. First, they contend that it is of controlling significance that the grants or credits are directed to the parents rather than to the schools. This is the same argument made in support of the tuition reimbursements and rests on the same reading of the same precedents of this Court, primarily *Everson* and *Allen*. Our treatment of this issue in Part II–B, *supra*, at 780–785, is applicable here and requires rejection of this claim.[50] Second, appellees place their strongest reliance on *Walz* v. *Tax Comm'n, supra,* in which New York's property tax exemption for religious organizations was upheld. We think that *Walz* provides no support for appellees' position. Indeed, its rationale plainly compels the conclusion that New York's tax package violates the Establishment Clause.

---

[50] Appellants conceded that "should the Court decide that Section 2 of the Act does not violate the Establishment Clause, we are unable to see how it could hold otherwise in respect to Sections 3, 4 and 5." Brief for Appellants 42–43. We agree that, under the facts of this case, the two are legally inseparable and that the affirmative of appellants' statement is also true, *i. e.,* if § 2 *does* violate the Establishment Clause so, too, do the sections conferring tax benefits.

Tax exemptions for church property enjoyed an apparently universal approval in this country both before and after the adoption of the First Amendment. The Court in *Walz* surveyed the history of tax exemptions and found that each of the 50 States has long provided for tax exemptions for places of worship, that Congress has exempted religious organizations from taxation for over three-quarters of a century, and that congressional enactments in 1802, 1813, and 1870 specifically exempted church property from taxation. In sum, the Court concluded that "[f]ew concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally." 397 U. S., at 676–677.[51] We know of no historical precedent for New York's recently promulgated tax relief program. Indeed, it seems clear that tax benefits for parents whose children attend parochial schools are a recent innovation, occasioned by the growing financial plight of such nonpublic institutions and designed, albeit unsuccessfully, to tailor state aid in a manner not incompatible with the recent decisions of this Court. See *Kosydar* v. *Wolman*, 353 F. Supp. 744 (SD Ohio 1972), aff'd *sub nom. Grit* v. *Wolman, post,* p. 901.

But historical acceptance without more would not alone have sufficed, as "no one acquires a vested or protected right in violation of the Constitution by long use." *Walz,* 397 U. S., at 678. It was the reason underlying that long history of tolerance of tax exemptions for religion that proved controlling. A proper respect for both the Free Exercise and the Establishment Clauses compels the State

---

[51] The separate opinions of Mr. Justice Harlan and Mr. Justice Brennan also emphasize the historical acceptance of tax-exempt status for religious institutions. See 397 U. S., at 680, 694.

to pursue a course of "neutrality" toward religion. Yet governments have not always pursued such a course, and oppression has taken many forms, one of which has been taxation of religion. Thus, if taxation was regarded as a form of "hostility" toward religion, "exemption constitute[d] a reasonable and balanced attempt to guard against those dangers." *Id.*, at 673. Special tax benefits, however, cannot be squared with the principle of neutrality established by the decisions of this Court. To the contrary, insofar as such benefits render assistance to parents who send their children to sectarian schools, their purpose and inevitable effect are to aid and advance those religious institutions.

Apart from its historical foundations, *Walz* is a product of the same dilemma and inherent tension found in most government-aid-to-religion controversies. To be sure, the exemption of church property from taxation conferred a benefit, albeit an indirect and incidental one. Yet that "aid" was a product not of any purpose to support or to subsidize, but of a fiscal relationship designed to minimize involvement and entanglement between Church and State. "The exemption," the Court emphasized, "tends to complement and reinforce the desired separation insulating each from the other." *Id.*, at 676. Furthermore, "[e]limination of the exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes." *Id.*, at 674. The granting of the tax benefits under the New York statute, unlike the extension of an exemption, would tend to increase rather than limit the involvement between Church and State.

One further difference between tax exemptions for church property and tax benefits for parents should be

noted. The exemption challenged in *Walz* was not restricted to a class composed exclusively or even predominantly of religious institutions. Instead, the exemption covered all property devoted to religious, educational, or charitable purposes. As the parties here must concede, tax reductions authorized by this law flow primarily to the parents of children attending sectarian, nonpublic schools. Without intimating whether this factor alone might have controlling significance in another context in some future case, it should be apparent that in terms of the potential divisiveness of any legislative measure the narrowness of the benefited class would be an important factor.[52]

In conclusion, we find the *Walz* analogy unpersuasive, and in light of the practical similarity between New York's tax and tuition reimbursement programs, we hold that neither form of aid is sufficiently restricted to assure that it will not have the impermissible effect of advancing the sectarian activities of religious schools.

## III

Because we have found that the challenged sections have the impermissible effect of advancing religion, we need not consider whether such aid would result in entanglement of the State with religion in the sense of "[a] comprehensive, discriminating, and continuing state surveillance." *Lemon* v. *Kurtzman,* 403 U. S., at 619. But the importance of the competing societal interests implicated here prompts us to make the further observation that, apart from any specific entanglement of the State in particular religious programs, assistance of the sort here involved carries grave potential for entanglement in the broader sense of continuing political strife over aid to religion.

---

[52] See also n. 38, *supra.*

Few would question most of the legislative findings supporting this statute. We recognized in *Board of Education* v. *Allen,* 392 U. S., at 247, that "private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience," and certainly private parochial schools have contributed importantly to this role. Moreover, the tailoring of the New York statute to channel the aid provided primarily to afford low-income families the option of determining where their children are to be educated is most appealing.[53] There is no doubt that the private schools are confronted with increasingly grave fiscal problems, that resolving these problems by increasing tuition charges forces parents to turn to the public schools, and that this in turn—as the present legislation recognizes— exacerbates the problems of public education at the same time that it weakens support for the parochial schools.

These, in briefest summary, are the underlying reasons for the New York legislation and for similar legislation in other States. They are substantial reasons. Yet they must be weighed against the relevant provisions and purposes of the First Amendment, which safeguard the separation of Church from State and which have been regarded from the beginning as among the most cherished features of our constitutional system.

One factor of recurring significance in this weighing process is the potentially divisive political effect of an aid program. As Mr. Justice Black's opinion in *Everson*

---

[53] As noted in the opinion below: "This [litigation] is, in essence, a conflict between two groups of extraordinary good will and civic responsibility. One group fears the diminution of parochial religious education which is thought to be an integral part of their rights to the free exercise of religion. The other group, equally dedicated, believes that encroachment of Government in aid of religion is as dangerous to the secular state as encroachment of Government to restrict religion would be to its free exercise." 350 F. Supp., at 660.

v. *Board of Education, supra,* emphasizes, competition among religious sects for political and religious supremacy has occasioned considerable civil strife, "generated in large part" by competing efforts to gain or maintain the support of government. 330 U. S., at 8–9. As Mr. Justice Harlan put it, "[w]hat is at stake as a matter of policy [in Establishment Clause cases] is preventing that kind and degree of government involvement in religious life that, as history teaches us, is apt to lead to strife and frequently strain a political system to the breaking point." *Walz* v. *Tax Comm'n,* 397 U. S., at 694 (separate opinion).

The Court recently addressed this issue specifically and fully in *Lemon* v. *Kurtzman.* After describing the political activity and bitter differences likely to result from the state programs there involved, the Court said:

> "The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow." 403 U. S., at 623.[54]

The language of the Court applies with peculiar force to the New York statute now before us. Section 1 (grants for maintenance) and § 2 (tuition grants) will require continuing annual appropriations. Sections 3, 4, and 5 (income tax relief) will not necessarily require

---

[54] The Court in *Lemon* further emphasized that political division along religious lines is to be contrasted with the political diversity expected in a democratic society: "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. Freund, Comment, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680, 1692 (1969)." 403 U. S., at 622.

annual re-examination, but the pressure for frequent enlargement of the relief is predictable. All three of these programs start out at modest levels: the maintenance grant is not to exceed $40 per pupil per year in approved schools; the tuition grant provides parents not more than $50 a year for each child in the first eight grades and $100 for each child in the high school grades; and the tax benefit, though more difficult to compute, is equally modest. But we know from long experience with both Federal and State Governments that aid programs of any kind tend to become entrenched, to escalate in cost, and to generate their own aggressive constituencies. And the larger the class of recipients, the greater the pressure for accelerated increases.[55] Moreover, the State itself, concededly anxious to avoid assuming the burden of educating children now in private and parochial schools, has a strong motivation for increasing this aid as public school costs rise and population increases.[56] In this situation, where the underlying issue is the deeply emotional one of Church-State relationships, the potential for seriously divisive political consequences needs no elaboration. And while the prospect of such divisive-

[55] As some 20% of the total school population in New York attends private and parochial schools, the constituent base supporting these programs is not insignificant.

[56] The self-perpetuating tendencies of any form of government aid to religion have been a matter of concern running throughout our Establishment Clause cases. In *Schempp,* the Court emphasized that it was "no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment," for what today is a "trickling stream" may be a torrent tomorrow. 374 U. S., at 225. See also *Lemon* v. *Kurtzman,* 403 U. S., at 624–625. But, to borrow the words from Mr. Justice Rutledge's forceful dissent in *Everson,* it is not alone the potential expandability of state tax aid that renders such aid invalid. Not even "three pence" could be assessed: "Not the amount but 'the principle of assessment was wrong.'" 330 U. S., at 40–41 (quoting from Madison's Memorial and Remonstrance).

ness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a "warning signal" not to be ignored. 403 U. S., at 625.

Our examination of New York's aid provisions, in light of all relevant considerations, compels the judgment that each, as written, has a "primary effect that advances religion" and offends the constitutional prohibition against laws "respecting an establishment of religion." We therefore affirm the three-judge court's holding as to §§ 1 and 2, and reverse as to §§ 3, 4, and 5.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, joined in part by MR. JUSTICE WHITE, and joined by MR. JUSTICE REHNQUIST, concurring in part and dissenting in part.*

I join in that part of the Court's opinion in *Committee for Public Education & Religious Liberty* v. *Nyquist, ante,* p. 756, which holds the New York "maintenance and repair" provision [1] unconstitutional under the Establishment Clause because it is a direct aid to religion. I disagree, however, with the Court's decisions in *Nyquist* and in *Sloan* v. *Lemon, post,* p. 825, to strike down the New York and Pennsylvania tuition grant programs and the New York tax relief provisions.[2] I believe the Court's decisions on those statutory provisions ignore the teachings of *Everson* v. *Board of Education,* 330 U. S. 1 (1947),

---

*[This opinion applies also to No. 72–459, *Sloan, Treasurer of Pennsylvania, et al.* v. *Lemon et al.,* and No. 72–620, *Crouter* v. *Lemon et al., post,* p. 825.]

[1] N. Y. Laws 1972, c. 414, § 1, amending New York Educ. Law, Art. 12, §§ 549–553 (Supp. 1972–1973).

[2] Pa. Laws 1971, Act 92, Pa. Stat. Ann., Tit. 24, § 5701 *et seq.* (Supp 1973–1974); N. Y. Laws 1972, c. 414, § 2, amending N. Y. Educ. Law, Art. 12–A, §§ 559–563 (Supp. 1972–1973); N. Y. Laws 1972, c. 414, §§ 3, 4, and 5, amending N. Y. Tax Law §§ 612 (c), 612 (j) (Supp. 1972–1973).

and *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and fail to observe what I thought the Court had held in *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970). I therefore dissent as to those aspects of the two holdings.[3]

While there is no straight line running through our decisions interpreting the Establishment and Free Exercise Clauses of the First Amendment, our cases do, it seems to me, lay down one solid, basic principle: that the Establishment Clause does not forbid governments, state or federal, to enact a program of general welfare under which benefits are distributed to private individuals, even though many of those individuals may elect to use those benefits in ways that "aid" religious instruction or worship. Thus, in *Everson* the Court held that a New Jersey township could reimburse *all* parents of school-age children for bus fares paid in transporting their children to school. Mr. Justice Black's opinion for the Court stated that the New Jersey "legislation, as applied, does no more than provide a general program to *help parents* get their children, regardless of their religion, safely and expeditiously to and from accredited schools." 330 U. S., at 18 (emphasis added).

Twenty-one years later, in *Board of Education* v. *Allen, supra,* the Court again upheld a state program that provided for direct aid to the parents of all schoolchildren including those in private schools. The statute there required "local public school authorities to lend textbooks free of charge to all students in grades seven through 12; students attending private schools [were] included." 392 U. S., at 238. Recognizing that *Everson* was the case "most nearly in point," the *Allen* Court interpreted *Everson* as holding that "the Establishment

---

[3] Mr. Justice Rehnquist's dissent, which I join, states the reasons why I believe the Court has gravely misrepresented the Court's opinion in *Walz.* In this opinion, I state additional reasons why I dissent from Parts II–B and II–C of the Court's opinion.

Clause does not prevent a State from extending the benefits of state laws to all citizens without regard for their religious affiliation . . . ." *Id.,* at 241–242. Applying that principle to the statute before it, the *Allen* Court stated:

"Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely *makes available to all children* the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. *Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." Id.,* at 243–244 (emphasis added).

The Court's opinions in both *Everson* and *Allen* recognized that the statutory programs at issue there may well have facilitated the decision of many parents to send their children to religious schools. *Everson* v. *Board of Education, supra,* at 17–18; *Board of Education* v. *Allen, supra,* at 242, 244. See *Norwood* v. *Harrison, ante,* at 463 n. 6 (1973). Indeed, the Court in both cases specifically acknowledged that some children might not obtain religious instruction but for the benefits provided by the State. Notwithstanding, the Court held that such an indirect or incidental "benefit" to the religious institutions that sponsored parochial schools was not a conclusive indicium of a "law respecting an establishment of religion." [4]

---

[4] In *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), the Court specifically distinguished *Everson* and *Allen* on the ground that those cases involved aid to the parents and children and not to parochial schools:

"The Pennsylvania statute, moreover, has the further defect of providing state financial aid directly to the church-related school. *This factor distinguishes both Everson and Allen, for in both those*

One other especially pertinent decision should be noted. In *Quick Bear* v. *Leupp,* 210 U. S. 50 (1908), the Court considered the question whether government aid to individuals who choose to use the benefits for sectarian purposes contravenes the Establishment Clause. There the Federal Government had set aside certain trust and treaty funds for the educational benefit of the members of the Sioux Indian Tribe. When some beneficiaries elected to attend religious schools, and the Government entered into payment contracts with the sectarian institutions, suit was brought to enjoin the disbursement of public money to those schools. Speaking of the constitutionality of such a program, the Court said:

> "But we cannot concede the proposition that Indians cannot be allowed to use their own money to educate their children in the schools of their own choice because the Government is necessarily undenominational, as it cannot make any law respecting an establishment of religion or prohibiting the free exercise thereof." *Id.,* at 81–82.

The essence of all these decisions, I suggest, is that government aid to individuals generally stands on an entirely different footing from direct aid to religious institutions. I say "generally" because it is obviously possible to conjure hypothetical statutes that constitute either a subterfuge for direct aid to religious institutions or a discriminatory enactment favoring religious over nonreligious activities. Thus, a State could not enact a statute providing for a $10 gratuity to everyone who attended religious services weekly. Such a law would plainly be governmental sponsorship of religious activities; no statutory preamble expressing purely sec-

---

*cases the Court was careful to point out that state aid was provided to the student and his parents—not to the church-related school. . . ." Id.,* at 621 (emphasis, except for case names, added).

ular legislative motives would be persuasive. But, at least where the state law is genuinely directed at enhancing a recognized freedom of individuals, even one involving both secular and religious consequences, such as the right of parents to send their children to private schools, see *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), the Establishment Clause no longer has a prohibitive effect.[5]

This fundamental principle which I see running through our prior decisions in this difficult and sensitive field of law, and which I believe governs the present cases, is premised more on experience and history than on logic. It is admittedly difficult to articulate the reasons why a State should be permitted to reimburse parents of private school children—partially at least—to take into account the State's enormous savings in not having to provide schools for those children, when a State is not allowed to pay the same benefit directly to sectarian schools on a per-pupil basis. In either case, the private individual makes the ultimate decision that may indirectly benefit church-sponsored schools; to that extent the state involvement with religion is substantially attenuated. The answer, I believe, lies in the experienced judgment of various members of this Court over the years that the balance between the policies of free exercise and establishment of religion tips in favor of the former when the legislation moves away from direct aid to religious institutions and takes on the character of general aid to individual families. This judgment reflects the caution with which we scrutinize any effort to give official support to religion and the tolerance with which we treat general welfare legislation. But, whatever its

---

[5] These considerations do not, however, justify similar state assistance accruing to the benefit of private schools having discriminatory policies. See *Norwood* v. *Harrison, ante,* at 461–468.

basis, that principle is established in our cases, from the early case of *Quick Bear* to the more recent holdings in *Everson* and *Allen,* and it ought to be followed here.

The tuition grant and tax relief programs now before us are, in my view, indistinguishable in principle, purpose, and effect from the statutes in *Everson* and *Allen.* In the instant cases as in *Everson* and *Allen,* the States have merely attempted to equalize the costs incurred by parents in obtaining an education for their children. The only discernible difference between the programs in *Everson* and *Allen* and these cases is in the method of the distribution of benefits: here the particular benefits of the Pennsylvania and New York statutes are given only to parents of private school children, while in *Everson* and *Allen* the statutory benefits were made available to parents of both public and private school children. But to regard that difference as constitutionally meaningful is to exalt form over substance. It is beyond dispute that the parents of public school children in New York and Pennsylvania presently receive the "benefit" of having their children educated totally at state expense; the statutes enacted in those States and at issue here merely attempt to equalize that "benefit" by giving to parents of private school children, in the form of dollars or tax deductions, what the parents of public school children receive in kind. It is no more than simple equity to grant partial relief to parents who support the public schools they do not use.

The Court appears to distinguish the Pennsylvania and New York statutes from *Everson* and *Allen* on the ground that here the state aid is not apportioned between the religious and secular activities of the sectarian schools attended by some recipients, while in *Everson* and *Allen* the state aid was purely secular in nature. But that distinction has not been followed in the past, see *Quick Bear* v. *Leupp, supra,* and is not likely to be considered

controlling in the future. There are at present many forms of government assistance to individuals that can be used to serve religious ends, such as social security benefits or "G. I. Bill" payments, which are not subject to nonreligious-use restrictions. Yet, I certainly doubt that today's majority would hold those statutes unconstitutional under the Establishment Clause.

Since I am unable to discern in the Court's analysis of *Everson* and *Allen* any neutral principle to explain the result reached in these cases, I fear that the Court has in reality followed the unsupportable approach of measuring the "effect" of a law by the percentage of the recipients who choose to use the money for religious, rather than secular, education. Indeed, in discussing the New York tax credit provisions, the Court's opinion argues that the "tax reductions authorized by this law flow primarily to the parents of children attending sectarian, nonpublic schools." *Ante,* at 794. While the opinion refrains from "intimating whether this factor alone might have controlling significance in another context in some future case," *ibid.,* similar references to this factor elsewhere in the Court's opinion suggest that it has been given considerable weight. Thus, the Court observes as to the New York tuition grant program: "Indeed, it is precisely the function of New York's law to provide assistance to private schools, *the great majority of which are sectarian." Ante,* at 783 (emphasis added).

With all due respect, I submit that such a consideration is irrelevant to a constitutional determination of the "effect" of a statute. For purposes of constitutional adjudication of that issue, it should make no difference whether 5%, 20%, or 80% of the beneficiaries of an educational program of general application elect to utilize their benefits for religious purposes. The "primary effect" branch of our three-pronged test was never, at least to my understanding, intended to vary with the

*number* of churches benefited by a statute under which state aid is distributed to private citizens.

Such a consideration, it is true, might be relevant in ascertaining whether the *primary legislative purpose* was to advance the cause of religion.   But the Court has, and I think correctly, summarily dismissed the contention that either New York or Pennsylvania had an improper purpose in enacting these laws.   The Court fully recognizes that the legislatures of New York and Pennsylvania have a legitimate interest in "promoting pluralism and diversity among . . . public and nonpublic schools," *ante,* at 773, in assisting those who reduce the State's expenses in providing public education, and in protecting the already overburdened public school system against a massive influx of private school children.   And in light of this Court's recognition of these secular legislative purposes, I fail to see any acceptable resolution to these cases except one favoring constitutionality.

I would therefore uphold these New York and Pennsylvania statutes.   However sincere our collective protestations of the debt owed by the public generally to the parochial school systems, the wholesome diversity they engender will not survive on expressions of good will.

Mr. Justice White joins this opinion insofar as it relates to the New York and Pennsylvania tuition grant statutes and the New York tax relief statute.

Mr. Justice Rehnquist, with whom The Chief Justice and Mr. Justice White concur, dissenting in part.

Differences of opinion are undoubtedly to be expected when the Court turns to the task of interpreting the meaning of the Religion Clauses of the First Amendment, since our previous cases arising under these Clauses, as the Court notes, "have presented some of the most perplexing questions to come before this Court."   *Ante,*

at 760. I dissent from those portions of the Court's opinion which strike down §§ 2 through 5, N. Y. Laws 1972, c. 414. Section 2 grants limited state aid to low-income parents sending their children to nonpublic schools and §§ 3 through 5 make roughly comparable benefits available to middle-income parents through the use of tax deductions. I find both the Court's reasoning and result all but impossible to reconcile with *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970), decided only three years ago, and with *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and *Everson* v. *Board of Education,* 330 U. S. 1 (1947).

I

The opinions in *Walz, supra,* make it clear that tax deductions and exemptions, even when directed to religious institutions, occupy quite a different constitutional status under the Religion Clauses of the First Amendment than do outright grants to such institutions. MR. CHIEF JUSTICE BURGER, speaking for the Court in *Walz,* said:

> "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.' *There is no genuine nexus between tax exemption and establishment of religion.*" 397 U. S., at 675 (emphasis added).

MR. JUSTICE BRENNAN in his concurring opinion amplified the distinction between tax benefits and direct payments in these words:

> "Tax exemptions and general subsidies, however, are qualitatively different. Though both provide

economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer. . . . Tax exemptions, accordingly, constitute mere passive state involvement with religion and not the affirmative involvement characteristic of outright governmental subsidy." *Id.*, at 690–691 (footnotes omitted).

Here the effect of the tax benefit is trebly attenuated as compared with the outright exemption considered in *Walz.* There the result was a complete forgiveness of taxes, while here the result is merely a reduction in taxes. There the ultimate benefit was available to an actual house of worship, while here even the ultimate benefit redounds only to a religiously sponsored school. There the churches themselves received the direct reduction in the tax bill, while here it is only the parents of the children who are sent to religiously sponsored schools who receive the direct benefit.

The Court seeks to avoid the controlling effect of *Walz* by comparing its historical background to the relative recency of the challenged deduction plan; by noting that in its historical context, a property tax exemption is religiously neutral, whereas the educational cost deduction here is not; and by finding no substantive difference between a direct reimbursement from the State to parents and the State's abstention from collecting the full tax bill which the parents would otherwise have had to pay.

While it is true that the Court reached its result in *Walz* in part by examining the unbroken history of property tax exemptions for religious organizations in this country, there is no suggestion in the opinion that only those particular tax exemption schemes that have roots in pre-Revolutionary days are sustainable against an

Establishment Clause challenge. As the Court notes in its opinion, historical acceptance alone would not have served to validate the tax exemption upheld in *Walz* because " 'no one acquires a vested or protected right in violation of the Constitution by long use.' " *Ante,* at 792, citing 397 U. S., at 678.

But what the Court gives in the form of *dicta* with one hand, it takes away in the form of its holding with the other. For if long-established use of a particular tax exemption scheme leads to a holding that the scheme is constitutional, that holding should extend equally to newly devised tax benefit plans which are indistinguishable in principle from those long established.

The Court's statements that "[s]pecial tax benefits, however, cannot be squared with the principle of neutrality established by the decisions of this Court," *ante,* at 793, and that "insofar as such benefits render assistance to parents who send their children to sectarian schools, their purpose and inevitable effect are to aid and advance those religious institutions," *ibid.,* are impossible to reconcile with *Walz.* Who can doubt that the tax exemptions which that case upheld were every bit as much of a "special tax benefit" as the New York tax deduction plan here, or that the benefits resulting from the exemption in *Walz* had every bit as much tendency to "aid and advance . . . religious institutions" as did New York's plan here?

The Court nonetheless declares that what has been authorized by the legislature is not a true deduction and in substance provides an incentive for parents to send their children to sectarian schools because the amount deductible from adjusted gross income bears no relationship to amounts actually expended for nonpublic education. Support for its notion that the authorization is essentially the same as a tax credit or a reimbursement is drawn from the fact that the net benefit under the

reimbursement plan established in § 2 of c. 414 is equal to the net tax savings for those at the lower-income end of the tax deduction plan.[1]  But the deduction here allowed is analytically no different from any other flat-rate exemptions or deductions currently in use in both federal and state tax systems.  Surely neither the standard deduction,[2] usable by those taxpayers who do not itemize their deductions, nor personal [3] or dependency exemptions,[4] for example, bear any relationship whatsoever to the actual expenses accrued in earning any of them.  Yet none of these could properly be called a reimbursement from the State.  And it would take more of a record [5] than is present in this case to prove that the

---

[1] N. Y. Laws 1972, c. 414, § 2, provided for flat tuition grants of $50 per year for parents who had children in nonpublic primary schools and $100 per year for parents whose children were attending nonpublic secondary schools.  Tuition reimbursements were limited, however, to 50% of amounts actually expended, and only those parents whose adjusted gross incomes were less than $5,000 were eligible.

A table of estimated benefits from the tax modifications contained in §§ 4 and 5 was submitted to the legislators.  That table indicated that taxpayers whose adjusted gross income fell between $5,000 and $9,000 received an estimated $50 per dependent attending nonpublic schools.  The number of allowable deductions was limited to three.

[2] See, e. g., 26 U. S. C. § 141 et seq.  Currently, the maximum standard deduction allowable under the income tax laws is $2,000, regardless of a taxpayer's income or the number of his dependents. §141 (b).  Similarly, there is a minimum low income allowance of $1,000 for those who do not qualify for the percentage standard deduction.  § 141 (c).  Between these extremes, there is a standard deduction of 15% of adjusted gross income, § 141 (b).

[3] See, e. g., 26 U. S. C. § 151 et seq.

[4] 26 U. S. C. § 151 (e).

[5] There was no discovery or other development of a factual record in this case.  There is, therefore, no indication as to how much tuition payments in nonpublic schools average and whether the relatively minor benefits under the plan could realistically be said to provide any incentive.  And yet the Court has struck down this

possibility of a slightly lower aggregate tax bill accorded New York taxpayers who send their dependents to non-public schools provides any more incentive to send children to such schools than personal exemptions provide for getting married or having children. That parents might incidentally find it easier to send children to nonpublic schools has not heretofore been held to require invalidation of a state statute. *Board of Education* v. *Allen, supra; Everson* v. *Board of Education, supra.*

The sole difference between the flat-rate exemptions currently in widespread use and the deduction established in §§ 4 and 5 is that the latter provides a regressive benefit. This legislative judgment, however, as to the appropriate spread of the expense of public and nonpublic education is consonant with the State's concern that those at the lower end of the income brackets are less able to exercise freely their consciences by sending their children to nonpublic schools, and is surely consistent with the "benevolent neutrality" we try to uphold in reconciling the tension between the Free Exercise and Establishment Clauses. *Walz, supra,* at 669. Regardless of what the Court chooses to call the New York plan, it is still abstention from taxation, and that abstention stands on no different theoretical footing, in terms of running afoul of the Establishment Clause, from any other deduction or exemption currently allowable for religious contributions or activities.[6] The invalidation of the New York plan is directly contrary to this Court's pronouncements in *Walz, supra.*

## II

In striking down both plans, the Court places controlling weight on the fact that the State has not pur-

---

plan, arguing that its inevitable result is to encourage parents to send children to religious schools.

[6] See, *e. g.*, 26 U. S. C. §§ 170, 2055, 2522.

ported to restrict to secular purposes either the reimbursements or the money which it has not taxed. This factor assertedly serves to distinguish *Board of Education* v. *Allen, supra,* and *Everson* v. *Board of Education, supra,* and compels the result that inevitably the primary effect of the plans is to provide financial support for sectarian schools.

In *Everson, supra,* the Court sustained the constitutional validity of a New Jersey statute and resulting school board regulation that provided, in part, for the direct reimbursement to parents of children attending sectarian schools of amounts expended in providing public transportation to and from such schools. Expressly noting that the challenged regulation undoubtedly helped children to get to church schools and that

"[t]here is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State . . . ," 330 U. S., at 17,

the majority in an opinion written by Mr. Justice Black held that the state scheme did not violate the Establishment Clause. And it was emphasized that the State in that case contributed no money to the schools, *id.,* at 18; rather it did no more than effectuate a secular purpose— the transportation of children safely and expeditiously to and from accredited schools.

Similarly in *Allen, supra,* a state program whereby secular textbooks were loaned to all children in accredited schools was approved as consistent with the Establishment Clause, even though the Court recognized that free books made it more likely that some children would choose to attend a sectarian school. 392 U. S., at 244. It was again emphasized that "no funds or books [were] fur-

nished to parochial schools," and that therefore "the financial benefit [was] to parents and children, not to schools." *Id.*, at 243–244. This factor was considered crucial in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), where the Court stated, at 621:

> "The Pennsylvania statute, moreover, has the further defect of providing state financial aid directly to the church-related school. *This factor distinguishes both Everson and Allen, for in both those cases the Court was careful to point out that state aid was provided to the student and his parents—not to the church-related school. . . ."* (Emphasis added.)

Both *Everson* and *Allen* gave significant recognition to the "benevolent neutrality" concept, and the Court was guided by the fact that any effect from state aid to parents has a necessarily attenuated impact on religious institutions when compared to direct aid to such institutions.

The reimbursement and tax benefit plans today struck down, no less than the plans in *Everson* and *Allen,* are consistent with the principle of neutrality. New York has recognized that parents who are sending their children to nonpublic schools are rendering the State a service by decreasing the costs of public education and by physically relieving an already overburdened public school system. Such parents are nonetheless compelled to support public school services unused by them and to pay for their own children's education. Rather than offering "an incentive to parents to send their children to sectarian schools," *ante,* at 786, as the majority suggests, New York is effectuating the secular purpose of the equalization of the cost of educating New York children that are borne by parents who send their children to nonpublic schools. As in *Everson* and *Allen,* the impact, if any, on religious

education from the aid granted is significantly diminished by the fact that the benefits go to the parents rather than to the institutions.

The increasing difficulties faced by private schools in our country are no reason at all for this Court to re-adjust the admittedly rough-hewn limits on governmental involvement with religion which are found in the First and Fourteenth Amendments. But, quite understandably, these difficulties can be expected to lead to efforts on the part of those who wish to keep alive pluralism in education to obtain through legislative channels forms of permissible public assistance which were not thought necessary a generation ago. Within the limits permitted by the Constitution, these decisions are quite rightly hammered out on the legislative anvil. If the Con-stitution does indeed allow for play in the legislative joints, *Walz, supra,* at 669, the Court must distinguish between a new exercise of power within constitutional limits and an exercise of legislative power which trans-gresses those limits. I believe the Court has failed to make that distinction here, and I therefore dissent.

MR. JUSTICE WHITE, joined in part by THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, dissenting.[*]

Each of the States regards the education of its young to be a critical matter—so much so that it compels school attendance and provides an educational system at public expense. Any otherwise qualified child is entitled to a free elementary and secondary school education, or at least an education that costs him very little as compared with its cost to the State.

This Court has held, however, that the Due Process Clause of the Fourteenth Amendment to the Constitu-

---

[*][This opinion applies also to No. 72–459, *Sloan, Treasurer of Pennsylvania, et al.* v. *Lemon et al.,* and No. 72–620, *Crouter* v. *Lemon et al., post,* p. 825.]

tion entitles parents to send their children to nonpublic schools, secular or sectarian, if those schools are sufficiently competent to educate the child in the necessary secular subjects. *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). About 10%· of the Nation's children, approximately 5.2 million students, now take this option and are not being educated in public schools at public expense. Under state law these children have a right to a free public education and it would not appear unreasonable if the State, relieved of the expense of educating a child in the public school, contributed to the expense of his education elsewhere. The parents of such children pay taxes, including school taxes. They could receive in return a free education in the public schools. They prefer to send their children, as they have the right to do, to nonpublic schools that furnish the satisfactory equivalent of a public school education but also offer subjects or other assumed advantages not available in public schools. Constitutional considerations aside, it would be understandable if a State gave such parents a call on the public treasury up to the amount it would have cost the State to educate the child in public school, or, to put it another way, up to the amount the parents save the State by not sending their children to public school.

In light of the Free Exercise Clause of the First Amendment, this would seem particularly the case where the parent desires his child to attend a school that offers not only secular subjects but religious training as well. A State should put no unnecessary obstacles in the way of religious training for the young. "When the state encourages religious instruction . . . it follows the best of our traditions." *Zorach* v. *Clauson,* 343 U. S. 306, 313–314 (1952); *Walz* v. *Tax Comm'n,* 397 U. S. 664, 676 (1970). Positing an obligation on the State to educate its children, which every State acknowledges, it should be wholly acceptable for the State to contribute

to the secular education of children going to sectarian schools rather than to insist that if parents want to provide their children with religious as well as secular education, the State will refuse to contribute anything to their secular training.

Historically, the States of the Union have not furnished public aid for education in private schools. But in the last few years, as private education, particularly the parochial school system, has encountered financial difficulties, with many schools being closed and many more apparently headed in that direction, there has developed a variety of programs seeking to extend at least some aid to private educational institutions. Some States have provided only fringe benefits or auxiliary services. Others attempted more extensive efforts to keep the private school system alive. Some made direct arrangements with private and parochial schools for the purchase of secular educational services furnished by those schools.[1] Others provided tuition grants to parents sending their children to private schools, permitted dual enrollments or shared-time arrangements or extended substantial tax benefits in some form.[2]

---

[1] This kind of program was adopted by Pennsylvania and Rhode Island and was declared invalid in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971).

[2] Based on State Aid to Non-Public Schools, a publication of the Department of Special Projects, National Catholic Educational Association, the following summarizes, as of February 1, 1972, the various types of aid to nonpublic schools available in the various States, exclusive of those types of support finally declared unconstitutional by this Court:

Direct Aid Programs:

Parental Grants or Reimbursement Schemes: 5 States (including New York and Pennsylvania).

Dual Enrollment (Shared Time): 9 States.

Tax Credits: 6 States (including New York).

The dimensions of the situation are not difficult to outline.[3] The 5.2 million private elementary and secondary school students in 1972 attended some 3,200 nonsectarian private schools and some 18,000 schools that are church related. Twelve thousand of the latter were Roman Catholic schools and enrolled 4.37 million pupils or 83% of the total nonpublic school membership. Sixty-

---

Leasing of Nonpublic School Facilities by Public School Systems: 4 States.

Educational Opportunities for Rural Students: 1 State (Alaska).

Innovative Programs: 1 State (Illinois).

Exemption from State Sales Tax for Educational and Janitorial Supplies: 1 State (North Dakota).

Auxiliary Services or Benefits:

Transportation: 24 States plus District of Columbia.

Textbooks and Instructional Materials: 14 States.

Health and Welfare Services (i. e., school physician, nurse, dental services, hygienist, psychologist, speech therapist, social worker, etc.): 15 States.

Driver Education: 7 States (applies only to dually enrolled students in South Dakota).

Services for Educationally Disadvantaged Children, Educational Testing, and Miscellaneous (principally aid services for deaf, blind, handicapped, or retarded children; educational testing; remedial programs, etc.): 11 States.

School Lunches: 2 States (New York and Louisiana).

Released Time: 2 States (Michigan and South Dakota).

Vocational Education: 2 States (Ohio and California).

Central Purchasing of Supplies: 2 States (Oregon and Washington).

Participation of Lay Teachers in Non-Public Schools in Public School Teachers Retirement Fund Scheme: 1 State (North Dakota).

A total of 16 States now extend one or more types of direct aid. 33 States, including almost all of the foregoing 16, offer auxiliary services or benefits. At least 19 States have constitutional or statutory barriers to any kind of direct aid to parochial schools.

[3] The data in this and the following paragraph of the text are taken from Final Report, President's Panel on Nonpublic Education, 1972, pp. 5–6, 15–19. See also Hearings on H. R. 16141 and other pending proposals, before the House Committee on Ways and Means, 92d Cong., 2d Sess., 118–119, 127–131.

two percent of nonpublic school students are concentrated in eight industrialized, urbanized States: New York, Pennsylvania, Illinois, California, Ohio, New Jersey, Michigan, and Massachusetts.[4]  Eighty-three percent of the nonpublic school enrollment is to be found in large metropolitan areas.  Nearly one out of five students in cities that are among the Nation's largest is enrolled in a nonpublic school.[5]

Nonpublic school enrollment has dropped at the rate of 6% per year for the past five years.  Projected to 1980, it is estimated that seven States (the eight mentioned in the text less Massachusetts) will lose 1,416,122 nonpublic school students.  Whatever the reasons, there has been, and there probably will continue to be, a movement to the public schools, with the prospect of substantial increases

---

[4] Nonpublic enrollments in these States are as follows: New York, 789,110; Pennsylvania, 518,435; Illinois, 451,724; California, 398,981; Ohio, 339,435; New Jersey, 298,548; Michigan, 264,089; and Massachusetts, 205,011.

[5] Enrollments in nonpublic schools in 15 of the country's largest cities are as follows:

| City | Nonpublic enrollment | Percentage of total |
|---|---|---|
| New York | 358,594 | 24.3 |
| Chicago | 208,174 | 27.3 |
| Philadelphia | 146,298 | 33.6 |
| Detroit | 58,228 | 16.5 |
| Los Angeles | 43,601 | 6.3 |
| New Orleans | 41,938 | 27.2 |
| Cleveland | 36,922 | 19.4 |
| Pittsburgh | 36,661 | 19.4 |
| Buffalo | 36,623 | 33.8 |
| Boston | 35,237 | 27.1 |
| Baltimore | 33,833 | 15.0 |
| Cincinnati | 32,653 | 27.4 |
| Milwaukee | 32,256 | 19.8 |
| San Francisco | 29,582 | 23.9 |
| St. Paul | 22,267 | 30.3 |

in public school budgets that are already under intense attack and with the States and cities that are primarily involved already facing severe financial crises. It is this prospect that has prompted some of these States to attempt, by a variety of devices, to save, or slow the demise of, the nonpublic school system, an educational resource that could deliver quality education at a cost to the public substantially below the per-pupil cost of the public schools.[6]

---

[6] The direct-aid programs for nonpublic schools available in the eight principally affected States listed in n. 4 are as follows:

*New York*

A. Full tuition and board for deaf and blind children educated at state-approved nonpublic schools.

B. Tuition (up to $2,000) for handicapped children educated at nonpublic schools.

C. Teacher salary payments to nonpublic schools operated by incorporated orphan asylum societies.

D. Omnibus Education Act.

1. Health and safety grants for nonpublic schools qualifying under Title IV of the Higher Education Act of 1965 as serving areas with high concentrations of poverty families.

2. Tuition assistance grants for parents with taxable incomes under $5,000.

3. Tax credit assistance for parents with incomes from $9,000–$25,000.

E. Mandated Services Act.

1. Reimbursement of nonpublic schools for costs of fulfilling state administrative requirements.

*Pennsylvania*

A. Dual enrollment.

B. Parent Reimbursement Act.

1. Reimbursement of parents for actual costs of nonpublic education of their children up to $75 for elementary school students and $150 for secondary school students.

*Illinois*

A. Grants to children from poverty families for actual costs of nonpublic education up to amount of state aid child would receive if attending public school.

There are, then, the most profound reasons, in addition to those normally attending the question of the constitutionality of a state statute, for this Court to proceed with the utmost care in deciding these cases. It should not, absent a clear mandate in the Constitution, invalidate these New York and Pennsylvania statutes and thereby not only scuttle state efforts to hold off serious financial problems in their public schools but

---

B. Special grants for innovative programs.

*California*

A. Tax credit assistance for parents with incomes ranging to $19,000. Maximum credit is $125 per child per year in nonpublic school.

Ohio

A. Dual enrollment with respect to vocational training.

B. Tax credit assistance for parents of nonpublic school students up to $90 per child per year.

New Jersey

No direct aid.

*Michigan*

A. Released time.

B. Dual enrollment.

Recent state constitutional amendment precludes all other forms of direct aid.

*Massachusetts*

Direct aid is barred by state constitutional provision.

The estimated 1970 population (in thousands) of Catholics in relation to the total population in each of these eight States was as follows:

| | Total Population | Estimated Catholics | Catholic/Total |
|---|---|---|---|
| Massachusetts | 5,241 | 2,947 | 56.2% |
| New Jersey | 7,332 | 2,898 | 39.5% |
| New York | 18,361 | 6,558 | 35.7% |
| Pennsylvania | 11,871 | 3,658 | 30.8% |
| Illinois | 10,751 | 3,455 | 32.1% |
| Michigan | 9,433 | 2,383 | 25.3% |
| Ohio | 10,612 | 2,265 | 21.3% |
| California | 20,250 | 4,053 | 20.0% |

Source: State Aid to Non-Public Schools, see n. 2, *supra*.

also make it more difficult, if not impossible, for parents to follow the dictates of their conscience and seek a religious as well as secular education for their children.

I am quite unreconciled to the Court's decision in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). I thought then, and I think now, that the Court's conclusion there was not required by the First Amendment and is contrary to the long-range interests of the country. I therefore have little difficulty in accepting the New York maintenance grant, which does not and could not, by its terms, approach the actual repair and maintenance cost incurred in connection with the secular education services performed for the State in parochial schools. But, accepting *Lemon* and the invalidation of the New York maintenance grant, I would, with THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, sustain the New York and Pennsylvania tuition grant statutes and the New York tax credit provisions.

No one contends that he can discern from the sparse language of the Establishment Clause that a State is forbidden to aid religion in any manner whatsover or, if it does not mean that, what kind of or how much aid is permissible. And one cannot seriously believe that the history of the First Amendment furnishes unequivocal answers to many of the fundamental issues of church-state relations. In the end, the courts have fashioned answers to these questions as best they can, the language of the Constitution and its history having left them a wide range of choice among many alternatives. But decision has been unavoidable; and, in choosing, the courts necessarily have carved out what they deemed to be the most desirable national policy governing various aspects of church-state relationships.

The course of these decisions has made it clear that the First Amendment does not bar all state aid to religion, of whatever kind or extent. States do, and

they may, furnish churches and parochial schools with police and fire protection as well as water and sewage facilities. Also, "[a]ll of the 50 States provide for tax exemption of places of worship, most of them doing so by constitutional guarantees." *Walz* v. *Tax Comm'n,* 397 U. S., at 676. This is a multimillion-dollar benefit to religious institutions, see DOUGLAS, J., dissenting, in *Walz, supra,* at 714, but a benefit that this Court has held is wholly consistent with the First Amendment. Bus transportation may be furnished to students attending parochial schools as well as to those going to public schools. *Everson* v. *Board of Education,* 330 U. S. 1 (1947). So, too, the State may furnish school books to such students, *Board of Education* v. *Allen,* 392 U. S. 236 (1968), although in doing so they "relieved those churches of an enormous aggregate cost for those books." *Walz, supra,* at 671–672. A State may also become the owner of the property of a church-sponsored college and lease it back to the college, all with the purpose and effect of permitting revenue bonds issued in connection with the college's operation to be tax exempt and working a lower rate of interest and substantial savings to the sectarian institution. *Hunt* v. *McNair, ante,* p. 734.

The Court thus has not barred all aid to religion or to religious institutions. Rather, it has attempted to devise a formula that would help identify the kind and degree of aid that is permitted or forbidden by the Establishment Clause. Until 1970, the test for compliance with the Clause was whether there was "a secular legislative purpose and a primary effect that neither advances nor inhibits religion . . ."; given a secular purpose, what is "the primary effect of the enactment?" *School District of Abington Township* v. *Schempp,* 374 U. S. 203, 222 (1963); *Board of Education* v. *Allen, supra,* at 243. In 1970, a third element surfaced—whether there is "an

excessive government entanglement with religion." *Walz* v. *Tax Comm'n, supra,* at 674. That element was not fatal to real property tax exemptions for church property but proved to be the crucial element in *Lemon* v. *Kurtzman, supra,* where the Court struck down the efforts by the States of Pennsylvania and Rhode Island to stave off financial disaster for their parochial school systems, the saving of which each of these States deemed important to the public interest. In accordance with one formula or the other, the laws in question furnished part of the cost incurred by private schools in furnishing secular education to substantial segments of the children in those States. Conceding a valid secular purpose and not reaching the question of primary effect, the Court concluded that the laws excessively, and therefore fatally, entangled the State with religion. What appeared to be an insoluble dilemma for the States, however, proved no insuperable barrier to the Federal Government in aiding sectarian institutions of higher learning by direct grants for specified facilities, *Tilton* v. *Richardson,* 403 U. S. 672 (1971). And *Hunt* v. *McNair, supra,* evidences the difficulty in perceiving when the State's involvement with religion passes the peril point.

But whatever may be the weight and contours of entanglement as a separate constitutional criterion, it is of remote relevance in the cases before us with respect to the validity of tuition grants or tax credits involving or requiring no relationships whatsoever between the State and any church or any church school. So, also, the Court concedes the State's genuine secular purpose underlying these statutes. It therefore necessarily arrives at the remaining consideration in the threefold test which is apparently accepted from prior cases: Whether the law in question has "a primary effect that neither advances nor inhibits religion." *School District of Abington Township* v. *Schempp, supra.* While purporting to

accept the standard stated in this manner, the Court strikes down the New York maintenance law, because its "effect, inevitably, is to subsidize and advance the religious mission of sectarian schools," and for the same reason invalidates the tuition grants. See *ante,* at 779–780. But the test is one of "primary" effect not *any* effect. The Court makes no attempt at that ultimate judgment necessarily entailed by the standard heretofore fashioned in our cases. Indeed, the Court merely invokes the statement in *Everson* v. *Board of Education,* 330 U. S., at 16, that no tax can be levied "to support any religious activities . . . ." But admittedly there was no tax levied here for the *purpose* of supporting religious activities; and the Court appears to accept those cases, including *Tilton,* that inevitably involved aid of some sort or in some amount to the religious activities of parochial schools. In those cases, the judgment was that as long as the aid to the school could fairly be characterized as supporting the secular educational functions of the school, whatever support to religion resulted from this direct, *Tilton* v. *Richardson, supra,* or indirect, *Everson* v. *Board of Education, supra; Board of Education* v. *Allen, supra; Walz* v. *Tax Comm'n, supra; Hunt* v. *McNair, supra,* contribution to the school's overall budget was not violative of the primary-effect test or of the Establishment Clause.

There is no doubt here that Pennsylvania and New York have sought in the challenged laws to keep their parochial schools system alive and capable of providing adequate secular education to substantial numbers of students. This purpose satisfies the Court, even though to rescue schools that would otherwise fail will inevitably enable those schools to continue whatever religious functions they perform. By the same token, it seems to me, preserving the secular functions of these schools is the overriding consequence of these laws and the resulting,

but incidental, benefit to religion should not invalidate them.

At the very least I would not strike down these statutes on their face. The Court's opinion emphasizes a particular kind of parochial school, one restricted to students of particular religious beliefs and conditioning attendance on religious study. Concededly, there are many parochial schools that do not impose such restrictions. Where they do not, it is even more difficult for me to understand why the primary effect of these statutes is to advance religion. I do not think it is and therefore dissent from the Court's judgment invalidating the challenged New York and Pennsylvania statutes.

THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join this opinion insofar at it relates to the New York and Pennsylvania tuition grant statutes and the New York tax credit statute.