146 N.J. Super. 532 (1977)
370 A.2d 87
ALAN J. KARCHER AND MARGARET T. KARCHER, INDIVIDUALLY AND AS GUARDIANS FOR ELIZABETH A. KARCHER, ELLEN M. KARCHER AND TIMOTHY Q. KARCHER, MINORS, PLAINTIFFS,
v.
BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, RICHARD C. LEONE, TREASURER OF THE STATE OF NEW JERSEY, AND FREDERICK BURKE, COMMISSIONER OF EDUCATION OF THE STATE OF NEW JERSEY, EACH IN HIS SOLE CAPACITY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 5, 1977.
*534 Alan J. Karcher argued the cause for plaintiffs (Messrs. Karcher, Reavey & Karcher, attorneys).
Ms. Mary Catherine Cuff, Deputy Attorney General, argued the cause for defendants (Mr. William F. Hyland, Attorney General, attorney).
COHEN, J.C.C.
This case presents another aspect of the ongoing development of public school financing in New Jersey Robinson v. Cahill (V), 69 N.J. 449 (1976), found the *535 Public School Education Act of 1975 to be facially constitutional, if fully funded. L. 1975, c. 212, N.J.S.A. 18A:7A-1 et seq. Plaintiffs complain that the act's formula for distribution of equalization aid to school districts unconstitutionally abridges their freedom of religion. That matter was not addressed by the Supreme Court in Robinson (V), or affected by its limited retention of jurisdiction. Plaintiffs also assert that the implementation by the Commissioner of Education of the equalization aid formula is contrary to the directions of the act. That is a matter of statutory construction that was not involved in Robinson (V), and is neither exclusively a school law dispute to be handled administratively, N.J.S.A. 18A:6-9; Silverman v. Millburn Bd. of Ed., 134 N.J. Super. 253 (Law Div. 1975), nor a state agency determination to be appealed directly to the Appellate Division. R. 2:2-3(a); cf. Colon v. Tedesco, 125 N.J. Super. 446 (Law Div. 1973). Both matters are here on cross-motions for summary judgment. There are no material facts in dispute.
The adult plaintiffs are residents and taxpayers of Sayreville. They are parents of the three minor plaintiffs, who are of school age. One attends a parochial school in the borough, one a parochial school outside the borough, and one a local public school. Plaintiffs have standing to raise the questions presented here. One of the plaintiffs, incidentally, is a member of the State Assembly.
The Public School Education Act of 1975 (hereinafter Chapter 212) was the legislative response to the constitutional problems raised in Robinson v. Cahill (I through IV)  62 N.J. 473 (1973), cert. den. 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed. 2d 219 (1973), 63 N.J. 196 (1973), cert. den. 414 U.S. 976, 94 S Ct. 292, 38 L.Ed.2d 219 (1973); 67 N.J. 35 and 67 N.J. 333 (1975) and 69 N.J. 133 (1975). In it was erected a framework on which to build a "thorough and efficient system of free public schools." N.J. Const., Art. 8, § 4, Para. 1. A key part of Chapter 212 is § *536 18's allocation formula for equalization aid to local school districts for current expenses. N.J.S.A. 18A:7A-18. The purpose of the formula is to distribute state aid to local districts so as to adjust local variations in ability to support the schools through real property taxes.
The two major variables in the application of the formula to each district (other than local budgeted expenses) are (1) the value of real property tax ratables in the district and (2) the number of pupils for whose education the district is responsible. Basically, the poorer the district in ratables, the more aid per pupil and, the more pupils, the more total aid. The calculation is more complex than described, but, for present purposes, the model is sufficiently accurate.
The pupils to be counted in each district are those described by the phrase "resident enrollment." The meaning of that phrase will be explored below. It is enough for now to say that it plainly means public school pupils only, and does not include nonpublic school pupils. It is this distinction that creates plaintiffs' constitutional argument.
Two of the minor plaintiffs have chosen to attend parochial school, with their parents' approval. The family decision, the plaintiffs say, was an exercise of the free expression of their religious beliefs, an exercise that is constitutionally guaranteed. That decision, they argue, was one that cost them money under Chapter 212 because it deprived them and the taxing district of state aid revenues. Imposing such cost burdens on parochial school families is constitutionally impermissible, they say, and conclude that the only way to rectify the unlawful imbalance is to include parochial school pupils in the local pupil count for the state aid formula.
The result in the state aid calculations would be both a decrease in the local tax base per pupil and an increase in the pupil count, thus affording a certain potentiating effect. And all based, of course, on phantom pupils and nonexistent costs. The relative impact on each district would depend on *537 the number of nonpublic school students from families resident in the district.[1]
There is a liminal difficulty with plaintiffs' argument. It is that the cost burden allegedly imposed on the plaintiffs by the loss of state aid does not target them as a parochial school family but, rather, is shared by all Sayreville taxpayers qua taxpayers. Plaintiffs' only extra burden is their own belief that they have diminished state aid to Sayreville by enrolling two children in parochial school. That does not touch a constitutionally protectible interest, because it ignores another threshold difficulty. It is that the absence of parochial and other private school pupils from Sayreville's public schools actually reduces the dollar burden on every Sayreville taxpayer. There is a loss of state aid, but there is a more than offsetting savings in local educational costs. It certainly costs the Karchers to send two of their children to nonpublic school. But their costs may not constitutionally be subsidized. Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). No reason appears why Sayreville's taxpayers should gain tax relief, beyond the absence of school costs, from the Karcher children's attending nonpublic school.
But all of that aside, the valid purpose of the equalization aid formula is to adjust the varying abilities of local districts to support their public schools. Sayreville does not financially support education for pupils attending nonpublic schools. Counting nonpublic school pupils would give local taxpayers equalization aid to meet a cost that does not exist. As taxpayers, plaintiffs are not constitutionally entitled to such pointless state aid. As a parochial school family plaintiffs are treated just like any public school family similarly situated. Chapter 212 makes no distinction between them. Sayreville's local taxes are reduced by the number of its *538 children in non public schools. But their absence from public school also decreases its share of state equalization aid. That is both lawful and sensible, even if it reduces the benefits to Sayreville's taxpayers of not publicly educating a number of their children. The Constitution does not, under the guise of religious freedom, entitle the taxpayers of a district with a large parochial school population to retain all of the cost-saving benefits thereof. It, therefore, does not prohibit use of a state aid formula that diminishes those benefits.
Plaintiffs' other contention is that the Commissioner of Education unlawfully administers the equalization aid formula by counting public school pupils, contrary to the requirements of Chapter 212. What we deal with is the definition of "resident enrollment" in N.J.S.A. 18A:7A-3. It reads:
"Resident enrollment" means the number of pupils who are resident of the district and are enrolled in day or approved evening schools on the last school day of September of the pre-budget year and are attending the public schools of the district or a school district * * * to which the district of residence pays tuition. * * *
The Commissioner collects information from the local districts by means of a form he prescribes, SA-1, on which each district submits the local enrollment figures as of the last school day in September. He neither asks for nor receives information beyond the September end enrollment figures. The form must be submitted by October 5 of the pre-budget year. Plaintiffs point out that the statute requires the Commissioner to count resident pupils "who are * * * enrolled * * * and are attending the public schools." * * *. (emphasis supplied). They argue that those words must mean something beyond merely "enrolled" and that they require the Commissioner to take into account "average daily attendance"  that is, the number of pupils actually in attendance on each day during the school year. The Department *539 of Education, during the summer following each school year, compiles the average daily enrollment and average daily attendance for each school district. Some forms of federal aid require the Commissioner to make periodic reports of average daily attendance.
The phrase "enrolled * * * and * * * attending" is not new to state school aid formulae. The 1954 state school aid law, R.S. 18:10-29.30 et seq.; L. 1954, c. 85, distributed foundation aid on the basis of average daily enrollment, with September-end enrollment used only for estimation of state aid for local budget purposes. Aid payments were later adjusted according to the average daily enrollment figures when compiled. The result was a potentially serious shortfall in aid to districts who average daily enrollment did not meet the September end enrollment figures. In response to that difficulty the law was changed in 1966 to provide for distribution of foundation aid based on September-end enrollment alone, under a definition using "enrolled * * * and * * * attending" language essentially the same as in Chapter 212. N.J.S.A. 18A:58-2 (repealed); L. 1966, c. 31, § 1. The school aid building law also uses "enrolled * * * and * * * attending" language. N.J.S.A. 18A:58-21. Compare N.J.S.A. 18A:58-5.1 (repealed) which granted special additional state aid to districts having average daily enrollment of ten or more pupils living on nontaxable state lands.
The Legislature has had experience with the distribution of state school aid by September-end enrollment and by average daily enrollment, and with the distribution of federal aid by average daily attendance. Plainly, it understands the difference among them.[2] In Chapter 212 the *540 Legislature chose a method of aid distribution based upon the same "enrolled * * * and * * * attending" language that had been in use for many years and had been administratively implemented by a September-end count of enrollment with no subsequent modification by an attendance factor. It is impossible to believe that the Legislature intended to call for a wholly new set of rules by adopting the same language in the new statute.
September-end enrollment may well be an imperfect reflection of all actual school costs. But it is an accurate measure of fixed costs, which do not vary with attendance and which form the major part of districts' current expenses. State aid must be clearly determined in order to be considered in local budget decisions. See N.J.S.A. 18A:7A-27 and 28. New Jersey has had its experience with year-end aid adjustments and their unpredicted surprises. In 1966 the law was changed to avoid those results. There is no reason to believe the Legislature wrote Chapter 212 to recreate those problems. The Commissioner's practice accurately reflects the Legislature's intent.
Defendants' motions for summary judgment are granted, plaintiffs' denied. No costs.
NOTES
[1] Defendants stipulated that if nonpublic school pupils were counted, Sayreville's share of Chapter 212 equalization aid would increase.
[2] The practical difference is a substantial one. Distribution of Chapter 212 equalization aid according to average daily attendance would shift millions of aid dollars from the inner cities to districts better able to finance their schools. There seems to be a consistent correlation between depressed attendance and depressed property tax base. One wonders whether legislators who voted for Chapter 212 did so without ascertaining the dollar impact on the various municipalities. Such information, supplied by the Commissioner, would have been calculated according to his understanding of how pupils were to be counted.