889 F.2d 192
 Jonathan CLAYTON, a minor, by Connie CLAYTON, his next
friend; Steve Blakley, a minor, by Tressia Blakley, his
next friend; David Mareth, a minor, by Marlene Mareth, his
next friend; Mark Flummerfelt, a minor, by Carolyn
Flummerfelt, his next friend; Michael Beagle, a minor, by
James M. Beagle, his next friend; George Fox, a minor, by
Joan Fox, his next friend; Amy Dianne Wolf, a minor, by
Frances Ann Wolf, her next friend; Anna Svetlecic, a minor,
by Vickie Svetlecic, her next friend; Connie Clayton;
Tressia Blakley; Vickie Svetlecic; Walter Welch; Sherry
Welch; Robert Mareth; Marlene Mareth; Michael
Flummerfelt; Carolyn Flummerfelt; Frances Ann Wolf; Joan
Fox; Howard Fox, Jr.; and James M. Beagle, Appellees,
v.
Richard M. PLACE; Glen Garrett; Rex Henderson; Allen
Keeling; Art Negre; Jacqueline L. Stephens; Jim Terry;
All in their individual and official capacities and Purdy
R-2 School District, Appellants.
 No. 88-2493.
 United States Court of Appeals,
Eighth Circuit.
 Nov. 17, 1989.
 
 ORDER DENYING PETITION FOR REHEARING AND SUGGESTION FOR
REHEARING EN BANC.
 Before LAY, Chief Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges.
 
 
 1
 The suggestion for rehearing en banc has been considered by the court and is denied by reason of the lack of majority of active judges voting to rehear the case en banc. Chief Judge Lay, Judges McMillian, Arnold and John R. Gibson dissent from the denial of the suggestion for rehearing en banc.
 
 
 2
 The petition for rehearing is also denied.
 
 
 3
 JOHN R. GIBSON, Circuit Judge, with whom LAY, Chief Judge, McMILLIAN and ARNOLD, Circuit Judges, join, dissenting.
 
 
 4
 I respectfully dissent from the decision of a bare majority of this court to deny rehearing en banc in this case. The district court's findings of fact, Clayton v. Place, 690 F.Supp. 850, 851-56 (W.D.Mo.1988), demonstrate overwhelmingly that the religious views of five churches in Purdy, Missouri, caused the school board to refuse to change its rule prohibiting social dancing.[1] These findings compel the conclusion that the test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), has not been satisfied.
 
 
 5
 The opinion of the panel, Clayton v. Place, 884 F.2d 376 (8th Cir.1989), properly recognizes that the district court's findings of fact are reviewed under the clearly erroneous standard, but the ultimate question of the rule's constitutionality is a mixed one of law and fact. There is no claim that any finding of fact is clearly erroneous.
 
 
 6
 It is true, as the panel opinion states, that the rule is facially secular; the text of the rule does not explicitly state that dancing is prohibited for religious reasons. While the origins of the rule are not described, the issues before us deal with the enforcement of the rule and the board's refusal to change it. The Lemon test cannot be circumvented by merely omitting from a rule any explicit statement of religious purpose. Rather, the first part of the Lemon test depends upon the government's "actual purpose" in making a decision. Edwards v. Aquillard, 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). Moreover, while courts are "normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." Id. at 586-87, 107 S.Ct. at 2579. In this case, as in Aguillard, the board has "identified no clear secular purpose" for continuing to enforce its rule. Id. at 585, 107 S.Ct. at 2578.[2] In contrast, the findings of the district court make abundantly clear that adherence to the rule does have a clear religious purpose. Cf. id. at 587-93, 107 S.Ct. at 2579-82 (examining the legislative history of an act to determine whether it was motivated by a religious purpose); id. at 597-602, 107 S.Ct. at 2584-87 (Powell, J., and O'Connor, J., concurring) (same); Wallace v. Jaffree, 472 U.S. 38, 56-57, 105 S.Ct. 2479, 2489-90, 86 L.Ed.2d 29 (1985) (same). The panel's conclusions in applying the Lemon test fail to give proper consideration to the findings of the district court, which must be set out in some detail.
 
 
 7
 During 1985-86, the parents and students involved in this litigation sought to change the "no dance" policy. The parents first asked Richard Place, the Superintendent of Schools, why dances were prohibited. Place answered that it was because Purdy was a conservative, religious community. They then asked if the rule was in effect because the Baptists opposed dancing, and Place answered, "Let's just say protestants." Prior to the school board meeting at which the proposal to permit dances was discussed, board member Keeling stated that he opposed changing the rule because his church preached that it was wrong and immoral to dance. Board member Terry told one of the plaintiffs that he had voted to permit dances in the past but caught so much "flak" from the ministers that he would vote against it this time. Board member Negre also declared that his church was opposed to dancing. At the February 10, 1986, meeting when the request to permit dances was initially made, Reverend Davis of the Free Will Baptist Church and his wife were present to state their opposition to a change in the rule. After Reverend Davis spoke, someone asked board president Garrett about the separation of church and state. Garrett responded that, "you'd better hope there's never separation of God and school." Clayton, 690 F.Supp. at 852.
 
 
 8
 After the meeting, the Ministerial Alliance, composed of ministers from the First Baptist, the First Assembly of God, the First Free Will Baptist, the Macedonia Free Will Baptist, and the First Christian Churches,[3] met to plan the opposition to changing the rule. The ministers agreed to persuade their members to attend the March meeting to fight the proposed change in the rule.
 
 
 9
 The minister of the First Baptist Church spoke to his congregation about the dance issue, and encouraged them to attend the meeting and fight the proposed change. In addition, his congregation prayed for board member Blakely's soul because he tried to change the rule. Id. at 853.
 
 
 10
 The minister of the First Assembly of God Church testified that he would refer any member of his congregation who engaged in dancing to the Presbyters of the church for counseling. He also encouraged the congregation to attend the March meeting and reminded them of the church's position on dancing. To become a member of the First Assembly of God Church, a person must agree to be separate from worldliness, which includes dancing.
 
 
 11
 The minister of the Free Will Baptist Church believes and preaches that dancing is sinful, prohibited by scripture, and possibly satanic. He has preached against dancing from the pulpit and has had a private counseling session with any member of his congregation who engaged in dancing. Before the board met to consider the proposed change, he contacted all but one of the members to voice his opposition to school dancing. He also informed his church members that there would be a petition for them to sign to indicate their opposition to the proposed change.
 
 
 12
 The Sunday before the board meeting, the congregation of Macedonia Free Will Baptist Church discussed the rule and board member Henderson was present at the discussion. Henderson promised that there would be no dancing at the schools as long as he was on the school board, and he encouraged everyone to go to the meeting to show their opposition to any change in the rule. The minister of the church, who has said during church services that he believes dancing is inappropriate behavior, also discussed his beliefs with board members Henderson and Negre.
 
 
 13
 There were 250 to 400 people in attendance at the March 10, 1986 board meeting. When the ban on dances was discussed, no direct mention of religion was made, but a letter from the Ministerial Alliance was read in its entirety. Reverend Davis of the Free Will Baptist Church argued that the "no dance" rule should not be changed. As he concluded, he asked the people in the crowd to signify their opposition to changing the rule by standing. The overwhelming majority of people stood in opposition to the proposed change in the rule. The board later held a closed session. While the board did not take a formal vote, it left the rule intact.
 
 
 14
 On April 18, 1986, one of the parents requested permission to rent the elementary school building for a school dance. Prior to that date, the school premises had been rented for various nonschool functions. At the April 29th meeting, however, the board voted in favor of suspending its rental policy.[4]
 
 
 15
 The district court, in applying the Lemon test to these facts,[5] found unpersuasive the testimony of the board members that they had opposed dancing in the schools for secular reasons, that there was no religious pressure to keep the rule, and that the rental policy was changed in response to problems with the liability of the school.[6] The district court then found that the rule prohibiting dancing was "inherently religious to the [Purdy] School Board." Clayton, 690 F.Supp. at 855. It singled out the elimination of the rental policy and found that the board's purported reasons for the action were a mere pretext for the real religious justification.
 
 
 16
 The findings of the district court, eloquent in their simplicity, compel its conclusion, and support mine, that the school board was motivated by religious purposes. Strictly speaking, this conclusion renders unnecessary a consideration of the second and third components of the Lemon test. Aguillard, 482 U.S. at 585, 107 S.Ct. at 2578; Wallace, 472 U.S. at 56, 105 S.Ct. at 2489. These findings, however, also convincingly demonstrate that the principal, or primary, effect of the board's actions was to advance the religious views of some members of the community, and that the retention and enforcement of the rule constituted excessive government entanglement with these religious views. Therefore, I conclude that the second and third components of the Lemon test are also not satisfied.
 
 
 17
 This is a case about religious tyranny. The members of five churches who have strong views on the religious significance of dancing successfully exerted pressure on the board to prohibit school dances. In the overall scheme of things, a dance at Purdy high school, with an enrollment of 519,[7] may not be of earth-shattering significance. Yet, our Constitution protects all citizens, including the students at Purdy high school, from religious, as well as political, oppression by a majority. The first amendment rights of those students sound a call that this court should not ignore. Our denial of the petition for rehearing en banc turns a deaf ear to the pleas of those students.
 
 
 18
 LAY, Chief Judge, with whom McMILLIAN and ARNOLD, Circuit Judges, join, dissenting.
 
 
 19
 Judge John R. Gibson's illuminating dissent should leave little doubt that the record demonstrates the Purdy school board's action focuses upon religion. The trial court's findings should be upheld under the clearly erroneous rule. I write separately to underscore my disagreement with the panel decision, and to elaborate on the no-dancing rule's failure to pass scrutiny under the "effects" component of the framework enunciated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
 
 
 20
 The second prong of the Lemon test considers whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices." County of Allegheny v. ACLU, --- U.S. ----, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1989) (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985)). "[T]he prohibition against governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.' " 109 S.Ct. at 3101 (quoting Wallace v. Jaffree, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment)) (emphasis in original).
 
 
 21
 The question, therefore, is "what viewers may fairly understand to be the purpose" of the no-dancing rule. Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). To the residents of Purdy--especially the students of Purdy R-II High School--the rule's message is unmistakably clear: the school district promotes the tenets of the local religious community. As a symbol of religious endorsement, the rule is no less obvious than a monument anchored to the schoolhouse lawn pronouncing: "THIS SCHOOL ADHERES TO THE BASIC TENETS OF THE MINISTERIAL ALLIANCE CHURCHES."
 
 
 22
 The message is not diluted, as the panel opinion suggests, by the fact that the school does not coerce students into refraining from dance away from school grounds. The Supreme Court has clearly held that proof of coercion is not a necessary element of any claim under the Establishment Clause. County of Allegheny, 109 S.Ct. at 3103 n. 47; Committee for Pub. Educ. v. Nyquist, 413 U.S. 756, 786, 93 S.Ct. 2955, 2972, 37 L.Ed.2d 948 (1973). Indeed, the Court's recent decisions invalidating government action on Establishment Clause grounds have involved no direct coercion. See, e.g., County of Allegheny, 109 S.Ct. at 3086 (nativity display); Texas Monthly, Inc. v. Bullock, --- U.S. ----, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (sales tax exemption for religious periodicals); Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (rule limiting teaching evolution in school); Ball, 473 U.S. at 373, 105 S.Ct. at 3216 (state-sponsored educational programs at nonpublic schools); Wallace, 472 U.S. at 38, 105 S.Ct. at 2479 (moment of silence); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting Ten Commandments on classroom walls); Nyquist, 413 U.S. at 756, 93 S.Ct. at 2955 (tuition reimbursement to parochial school parents). It is enough that the government clearly endorses religion or particular religious beliefs, for endorsement itself "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Lynch, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring); see also County of Allegheny, 109 S.Ct. at 3101. This message is particularly potent in the educational context. "The government's activities in this area can have a magnified impact on impressionable young minds, * * *." Ball, 473 U.S. at 383, 105 S.Ct. at 3216; see also Clayton v. Place, 690 F.Supp. 850, 856 (W.D.Mo.1988).
 
 
 23
 Perhaps the no-dancing rule's symbolic effect would be less potent if the rule could be explained, at least in part, by some plausible secular purpose. Although it is clear that identification of a secular purpose will not immunize governmental action from scrutiny under Lemon's effects test, see, e.g., Nyquist, 413 U.S. at 774, 93 S.Ct. at 2966, it might at least help mask the appearance that the action is crafted as a religious endorsement. If, for instance, the District maintained the no-dancing rule in order to avoid such problems as noise, building destruction, or shortage of supervisory personnel, the community members and students might well see it in a somewhat different light. Yet, as Judge Gibson aptly points out, no nonreligious purpose can be discerned here.
 
 
 24
 In Purdy, Missouri, the no-dancing rule differs little from a school's posting of the Ten Commandments on its classroom walls. See Stone, 449 U.S. at 39, 101 S.Ct. at 192. In both cases the school makes it abundantly clear to the students that it embraces the tenets of a particular religion. The panel implies that a difference lies in the fact the Ten Commandments are religious on their face whereas the no-dancing rule is facially nonreligious. See Clayton v. Place, 884 F.2d 376, 379 (8th Cir.1989). This distinction, however, fails to give due regard to the religious environment that provides the no-dancing rule its lifeblood: a small town in which five churches wielding political influence teach that social dancing is sinful. Only in this context can the effect of the rule be judged. See, e.g., County of Allegheny, 109 S.Ct. at 3103.
 
 
 25
 If the Establishment Clause carries any significant meaning, it is that government cannot maintain a practice that has as its sole purpose and primary effect the advancement of a tenet unique to particular religious groups. I dissent from the denial of the suggestion for rehearing en banc. I do so not only because the panel's decision is wrong; I do so because of the unwarranted precedent created in this circuit and throughout the nation providing a devious springboard for further destruction of the wall separating church and state.
 
 
 
 [1]
 The Purdy School District's Policy 502.29 states: "School dances are not authorized and school premises shall not be used for purposes of conducting a dance."
 
 
 [2]
 The panel opinion states that the extracurricular dancing in this case is wholly secular. The true issue in the case, however, is whether the "no dance" rule has a secular purpose
 
 
 [3]
 The district court noted that there were no Catholic, Lutheran, Presbyterian, Methodist, Jewish or Mormon members in the Ministerial Alliance. Clayton, 690 F.Supp. at 853
 
 
 [4]
 At a later meeting, the board adopted a policy of not renting to any outside group and not using school buildings for other than school purposes. Since that time, however, the building and grounds have been used for nonschool softball leagues, pick-up basketball games, and an exhibition donkey basketball game
 
 
 [5]
 The district court's conclusions of law discuss not only legal issues but also contain an assessment of the credibility of board members' statements which are, I think, findings of fact, and they will be treated as such. Clayton, 690 F.Supp. at 854-55
 
 
 [6]
 The record does not reveal why dancing poses greater liability problems than does donkey basketball. See supra note 4
 
 
 [7]
 137th Report of the Public Schools of Missouri 103 (1986)